[No. G035060. Fourth Dist., Div. Three. Mar. 21, 2006.]

MELVIN J. MAUDLIN, Plaintiff and Appellant, v.
PACIFIC DECISION SCIENCES CORPORATION et al., Defendants and
Respondents.

COUNSEL

Meisenheimer Herron & Steele, Matthew V. Herron and Robert M. Steele for Plaintiff and Appellant.

Jeffer, Mangels, Butler & Marmaro, Melvin N. A. Avanzado and Matthew D. Hinks for Defendants and Respondents.

OPINION

IKOLA, J.—When plaintiff Melvin J. Maudlin retired from his full-time employment with Pacific Decision Sciences Corporation (PDSC), he negotiated a deal with his longtime business partner, Hark Vasa, by which PDSC would pay him $2.9 million over a period of nearly 23 years. Their agreement allocated $150,000 for the redemption of Maudlin's 300,000 shares of stock (about 30 percent of the outstanding shares), with the balance of $2.75 million, designated by the transaction's documents as "deferred compensation," to be paid at the rate of $10,000 per month. The monies were paid as agreed for nearly five and one-half years. Payment stopped, however, when PDSC's new management expressed concerns about the legitimacy of the "deferred compensation" arrangement. Maudlin sued, inter alia, to recover

the balance of the payments he claimed he was owed. The court denied Maudlin any relief, concluding the contract was a disguised stock redemption that violated the California Corporations Code and evaded taxes. The court further found Maudlin was in pari delicto with Vasa and PDSC.

We reverse the judgment. By comparing the total payments under the contract with the amount of PDSC's retained earnings when the contract was executed, the court relied upon California corporate law that was superseded by statute effective in 1977. The court should have compared each individual payment with PDSC's retained earnings as of the date each payment was due. With respect to the tax evasion issue, we are unable to distinguish this case from a 40-year-old California Supreme Court precedent that compels us to conclude on this record that Maudlin was not in pari delicto. Therefore Maudlin is entitled to enforce the contract.

## FACTS

Maudlin and Vasa formed PDSC as a California corporation in 1983. PDSC was in the business of developing and licensing custom computer software to meet particularized needs of its client companies. Vasa served as the president and chief executive officer of PDSC and Maudlin was its corporate secretary. At the time of its formation, Vasa owned or controlled 54 percent of the stock and Maudlin owned 36 percent. The remaining 10 percent was owned by the person from whom PDSC had acquired its original business assets.

From the time of its formation in 1983 until 1997, Maudlin and Vasa both worked full time for PDSC. According to Vasa, he and Maudlin were both underpaid during the formative years, and they had made an informal agreement that "if some day the company makes a lot of money and the company has money available, we'll pay [Maudlin]." But no amounts were set. In 1997, Maudlin decided to retire when he suffered some serious health problems that made it difficult for him to continue providing full-time services to the corporation. Maudlin and Vasa discussed the means by which Maudlin could divest his interest in the company. Maudlin wanted to sell his shares of stock and PDSC wanted to buy them. Maudlin also wanted to be paid at the rate of $10,000 per month for a period longer than his life expectancy. The record is virtually silent as to any discussions held between Maudlin and Vasa when they derived $2.9 million as the total amount to be paid to Maudlin. Maudlin testified Vasa came up with the "total number" of $2.9 million paid at the rate of $10,000 per month for 275 months as "deferred compensation," and $150,000 for his shares of stock, but Maudlin

had "no idea" what the number was based upon. The evidence also disclosed, however, that shortly before Maudlin and Vasa struck their deal, PDSC had sold stock to a new investor for $10 per share, from which the inference is easily drawn that the $2.9 million to be paid to Maudlin was the approximate value of his 300,000 shares.

What is clear from the evidence, however, is that Vasa retained Anne Tahim, PDSC's accountant, to assist with the documentation for the transaction. Vasa told Tahim that "Maudlin was retiring, and he wanted to sell his stock, which the company wanted to buy. And also since [Maudlin] was retiring, [Vasa] wanted to provide him the retirement benefits . . . ." Vasa also "wanted a document that would be tax advantageous to the company," and that would require monthly $10,000 payments to Maudlin for 275 months.

Tahim recommended the use of a "secular trust" by which PDSC would pay $10,000 per month to the trust, and the trust would pay $10,000 each month to Maudlin. The document that was eventually signed on September 3, 1997, by Vasa as president of PDSC and as trustee of the "Pacific Decision Sciences Corporation Secular Trust" (Secular Trust), did just that and recited that Maudlin had rendered services to PDSC for which he had not been compensated in the amount of $2,750,000. By separate agreement of September 3, 1997, PDSC agreed to purchase Maudlin's 300,000 shares of PDSC stock for $150,000, payable in three annual installments, with the first payment due in the first quarter of 1998. The shareholder resolution authorizing the purchase required the corporation to buy the shares on November 10, 1997, while the board of directors' September 3, 1997 resolution provided that "effective immediately" Maudlin's shares would become PDSC treasury shares.

Following execution of the Secular Trust, PDSC began making the $10,000 monthly payments for the benefit of Maudlin, and continued making the payments until October 2000 when PDSC was acquired in a statutory merger by PDS Acquisition Corporation, a Delaware corporation that was a wholly owned subsidiary of Applied Digital Solutions, Inc. (ADS).[1] After the merger, PDSC continued making the monthly payments through May 2003. Maudlin also received payment of $145,000 for his stock, accepting the reduction in price in exchange for an accelerated payment.

---

[1] Sometime after the merger, PDS Acquisition Corporation changed its name back to Pacific Decision Sciences Corporation. As we discuss *post*, the rights and obligations of PDS Acquisition Corporation are identical to those of PDSC. Accordingly, we will refer to each as "PDSC" without further distinction.

The Secular Trust was established as a separate tax-paying entity, filing separate tax returns, reporting the distributions to Maudlin to the taxing authorities, and providing Maudlin with a schedule K-1 reflecting the payments he received. PDSC deducted the payments to the Secular Trust on its own tax returns, and Maudlin reported and paid taxes on his distributions as ordinary income.

In the course of the merger negotiations, ADS conducted a review of the books and records of PDSC with its own team of accountants, and the Secular Trust obligation was fully disclosed, both on the financial statements and on a formal disclosure schedule as part of the merger documents.

Under an employment agreement negotiated as part of the merger, Vasa continued as an employee of PDSC until he was replaced in January 2003. New management reviewed the books and records and made an inquiry of Maudlin about the Secular Trust. Maudlin asked Tahim to respond to the letter of inquiry, which she did. Not satisfied with the response, PDSC made its last $10,000 Secular Trust payment in May 2003, prompting Maudlin to bring this action against PDSC, ADS, and Vasa. For convenience, we will sometimes refer to PDSC and ADS collectively as the "PDSC defendants."

Maudlin's operative complaint alleged: (1) breach of contract against all defendants (first cause of action); (2) breach of fiduciary duty against Vasa (second cause of action); (3) negligence against Vasa (third cause of action); (4) a creditor's action against ADS pursuant to Code of Civil Procedure section 491.310 (fourth cause of action); (5) fraudulent conveyances against the PDSC defendants (fifth and sixth causes of action); (6) improper corporate distribution against Vasa (seventh cause of action); and (7) alter ego against the PDSC defendants (eighth cause of action). Vasa cross-complained against the PDSC defendants alleging causes of action for equitable indemnity, contribution, and declaratory relief.

Following a bench trial, the court ruled the Secular Trust was "void on the grounds that it was illegal, fraudulent, contrary to public policy and in violation of provisions of the California Corporations Code and the Federal Internal Revenue Code," and that the Secular Trust "was a subterfuge to disguise a stock repurchase as deferred compensation pay." The court further found the "conduct of the parties to the Trust—Maudlin and Vasa—were of substantially the same moral turpitude, although each was acting in his own self-interest while cooperating in the creation of the [Secular] Trust." The court concluded, "Maudlin and Vasa should be left as they were when they came to Court. Any other action would reward their wrongdoing at the

expense of the innocent parties PDSC and [ADS]." Accordingly, the court entered judgment in favor of the PDSC defendants on all of Maudlin's causes of action, and in favor of the PDSC defendants on all of Vasa's causes of action in his cross-complaint. As to Maudlin's complaint against Vasa, the court dismissed it without prejudice. Maudlin timely appealed the judgment. No other party filed a notice of appeal.

## DISCUSSION

*Introduction*

The court's judgment was based on the underlying premise that the Secular Trust "was a subterfuge to disguise a stock repurchase as deferred compensation pay." PDSC hoped it could successfully deduct the $10,000 monthly payments to Maudlin as an ordinary business expense on its tax returns, thereby cheating the taxing authorities of tax otherwise owed on some $120,000 per year. The court concluded the Secular Trust arrangement could not be enforced as a stock repurchase agreement because it violated "provisions of the California Corporations Code." Another premise of the court's judgment was the "innocence" of the PDSC defendants. Thus, the court found that "PDSC [and ADS] had no part in the preparation of the [Secular] Trust nor joined in any improper purposes" and that "Maudlin and Vasa should be left as they were when they came to Court. Any other action would reward their wrongdoing at the expense of the innocent parties PDSC and [ADS]."

On appeal, Maudlin does not challenge the court's finding that the Secular Trust arrangement was, in reality, a redemption of his stock. No doubt he recognizes substantial evidence supports that conclusion. Instead, he argues (1) the stock repurchase was not illegal under California corporate law, (2) contrary to the court's conclusion, Maudlin was *not* in pari delicto with Vasa and PDSC with regard to the contract's tax evading structure, and (3) the PDSC defendants were "legally bound by the understanding of the predecessor corporation."

Assuming the transaction was a stock repurchase, as found by the trial court, we conclude the transaction was *not* illegal under California's corporate law. The holdings of the cases relied upon by the PDSC defendants have *not* constituted correct statements of California law for some 29 years, having been decided long before the Legislature enacted Corporations Code sections 166 and 500 in their current form, effective in 1977. With regard to the tax evasion issue, and the court's conclusion that Maudlin was in pari delicto with Vasa and PDSC, we are unable to distinguish the material facts established by

the record in this case from the facts relied upon by the Supreme Court in deciding *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199 [45 Cal.Rptr. 878, 404 P.2d 486] (*Tri-Q*), wherein the Supreme Court concluded a litigant in the same position as Maudlin was *not* in pari delicto. Because *Tri-Q* is indistinguishable, we are bound by its result. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Finally, under California law governing the rights and obligations of surviving corporations in mergers, PDSC has the same obligation to Maudlin as it did before the merger. Since the transaction was enforceable by Maudlin before the merger, it is likewise enforceable against PDSC after the merger. Any complaint the PDSC defendants have with respect to the completeness of the disclosures made during the merger transaction cannot be used as a defense against Maudlin, who, according to the evidence, played absolutely no part in the merger transaction.

*The Transaction Was Not Illegal Under California Corporate Law*

The PDSC defendants argued in the trial court, as they argue on appeal, that Corporations Code section 500 (section 500) prohibits the redemption of stock from a shareholder unless, at the time the contract is executed, the corporation has retained earnings which are greater than the total contract price payable over the entire life of the contract.[2]

■ That was once the law, but has not been since 1977. Counsel's continued citation of cases that are no longer apt because the relevant statutes were changed some 29 years ago is puzzling, particularly when one of the cases the PDSC defendants rely upon expressly notes, inter alia, that the retained earnings test no longer needs to be met at the time the contract is executed, but only when the payments are made. (See *Kupetz v. Wolf* (9th Cir. 1988) 845 F.2d 842, 850 ["distributions to shareholders . . . must be scrutinized at the time they are made and not at the time the parties contracted that they would be made in the future"].)

Section 500, subdivision (a) states in pertinent part: "Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) except as follows: [¶] (a) The distribution may be made if the amount of the retained earnings of the corporation immediately

---

[2] The court found that PDSC had $357,864 in retained earnings at the time the Secular Trust was created. Actually, this was the amount of retained earnings shown on PDSC's balance sheet as of June 30, 1998, after some eight monthly payments had already been made, and $95,000 had already been paid on the agreement admittedly designated as the stock purchase agreement.

prior thereto equals or exceeds the amount of the proposed distribution."[3] The key to understanding section 500 is to note precisely what it restricts—a distribution to shareholders. Thus, unless a contract to pay a shareholder in the future is a "distribution" to the shareholder, the contract is not restricted or impaired by section 500.

Corporations Code section 166, which is embedded in the text of section 500 to ensure the reader does not miss its significance, defines the term "distribution to its shareholders." As relevant to the matter at hand: " 'Distribution to its shareholders' means . . . the purchase or redemption of its shares for cash. [*T*]*he time of any distribution by purchase or redemption of shares shall be the date cash . . . is transferred by the corporation, whether or not pursuant to a contract of an earlier date.*" (Corp. Code, § 166, italics added.) The meaning of section 166 is plain. A "distribution" occurs only when the cash is transferred, not when the contract is signed. And since section 500 applies *only* to "distributions," its restrictions must be measured when the distribution is made, i.e., when cash is transferred.

A leading treatise on California corporate law describes the purpose of the current law on corporate redemptions. "The present General Corporation Law was designed to eliminate the requirement that a corporation be able to purchase shares covered by a contract of purchase at the time the contract is entered into and to require such ability only as of the date of performance by the corporation. This is effected through the interplay of Corp. Code § 166 and the provisions of Chapter 5 of the General Corporation Law. Corp. Code § 166, the definition of 'distribution to its shareholders,' provides that the time of any distribution by purchase or redemption of shares shall be the date cash or property is transferred by the corporation, whether or not pursuant to a contract of an earlier date, provided that when a debt obligation that is a security (as defined in Com. Code § 8102) is issued in exchange for shares, the time of the distribution is the date when the corporation acquires the shares in that exchange. In turn, Corp. Code § 500 provides that a corporation shall not make any distribution unless the tests already described are met either (as to the 'retained earnings' test) immediately prior to the distribution or (as to the 'remaining assets' test) immediately after giving effect to the distribution. . . . Thus, the statutory scheme is to permit a distribution, whether or not by virtue of a contract entered into prior thereto, if the corporation meets the applicable tests at the time the distribution is made." (2 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1998) § 143.03, p. 8-60 (rel. 87-5/04).)

---

[3] Section 500 also sets forth an alternative test. But the retained earnings test of subdivision (a) is the only test addressed by the parties.

The cases relied upon by the PDSC defendants were either decided before the Legislature enacted Corporations Code sections 166 and 500 in their present form, or do not support their argument for other reasons. (See *McConnell v. Estate of Butler* (9th Cir. 1968) 402 F.2d 362 [predates 1977]; *Mindenberg v. Carmel Film Productions* (1955) 132 Cal.App.2d 598 [282 P.2d 1024] [same]; *Matter of National Tile & Terrazzo Co., Inc.* (9th Cir. 1976) 537 F.2d 329 [same]; *In re Qintex Entertainment, Inc.* (9th Cir. 1993) 8 F.3d 1353, 1355–1356 [interpreting Del. law which "prohibits a corporation from purchasing shares of its own stock 'when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation . . . .' " and noting " 'the older cases required legally available funds both at the time the agreement was made and at the time of performance. The modern trend is to uphold such agreements as valid, regardless of the situation at the time of the making of the agreement, and to enforce them, . . . *to the extent that the corporation has legally available funds at the time of repurchase*' "]; *In re Reliable Mfg. Corp.* (7th Cir. 1983) 703 F.2d 996 [interpreting same Del. statute and concluding it did not prohibit guarantee by corporation of third party's obligation to seller of the corporation's stock where corporation had sufficient surplus at time of the guarantee].)

The cases cited by the PDSC defendants interpreting Delaware law involved the question whether the repurchase of stock "impaired" the capital of the corporation, an issue not contested in this action. And California law has a bright-line test. If the retained earnings are sufficient to pay the cash at the time it is transferred in satisfaction of an earlier obligation to do so, the distribution is not prohibited. Delaware law helps not one whit on this issue.

Here, substantial evidence would support a finding that PDSC had sufficient retained earnings, both before and after the merger, to make the distributions to Maudlin through his last payment in May 2003.[4] But that is not really the issue. The PDSC defendants did not claim entitlement to reimbursement of payments already made. Instead, the PDSC defendants asserted no obligation to make any further payments. And they did so on the

---

[4] Not all of the trial exhibits were made a part of the record on appeal. From those available to us, we note evidence of retained earnings of $357,864 as of June 30, 1998, apparently later restated in the amount of $835,439. (Although the record is uncertain, the difference may be that one statement was prepared on a cash basis and the other on an accrual basis, or perhaps one statement was consolidated with a European and Asian subsidiary and the other was not.) Other evidence of retained earnings showed $2,471,777 as of June 30, 1999; $1,592,697 as of June 30, 2000; $48,320 as of December 31, 2000; $2,707,985 as of December 31, 2001; $1,533,491 as of December 31, 2002; $1,656,219 as of December 31, 2003; and $227,277 as of May 31, 2004.

basis of their assertion that the contract was an illegal contract for the repurchase of Maudlin's stock. At least insofar as the source of the alleged illegality is the restriction imposed by section 500, we have seen that the contract itself is not illegal. A distribution is prohibited only if cash is paid at a time when the retained earnings of the corporation are insufficient to cover the distribution. Making the particular distribution is the potentially prohibited act, not the execution of a contract which may or may not be impaired by future events. Thus, unless Maudlin is barred from enforcing the contract by reason of his participation in a tax evasion scheme, he is, as a matter of corporate law, entitled to enforce the Secular Trust arrangement as a stock redemption agreement. Whether he is entitled to payment of each installment when due depends upon the measure of retained earnings at the time each payment is to be made.

*Pursuant to Binding Supreme Court Precedent, Maudlin Is Not In Pari Delicto*

We turn to the court's conclusion Maudlin was in pari delicto regarding the contract's tax evading structure. In *Tri-Q, supra,* 63 Cal.2d 199, the California Supreme Court considered a set of facts virtually indistinguishable from those in this case. Leland Satre was an employee, officer, and shareholder of the Sta-Hi Corporation. Upon termination of his employment, Satre negotiated an agreement by which the corporation would repurchase one-half of his stock for $45,000. But the corporation insisted the contract be written to reflect a cash payment of $25,000 for the stock, with the remaining $20,000 to be paid in 10 semiannual installments of $2,000 each, pursuant to a separate "Severance Benefit Agreement," which recited the payments were being made in consideration of the assignment of certain nonexistent patent rights. (*Id.* at pp. 216–217.) "Both Sta-Hi and Satre understood that the recited consideration was not the true consideration, and that the [Severance Benefit Agreement] was actually intended to provide for the payment of the remaining $20,000 of the agreed purchase price of the stock." (*Id.* at p. 217.) Further, "the evidence indicated that the 'Severance Benefit Agreement' was intended by both parties to provide the balance of the consideration for the stock, and that Sta-Hi had insisted on the subterfuge to give it an improper income tax advantage." (*Id.* at pp. 217–218.) Satre was aware of Sta-Hi's purpose, but Satre's sole purpose was to obtain the agreed-upon purchase price. (*Id.* at p. 218.)

With the above evidence, the trial court in *Tri-Q* made findings nearly identical to the trial court findings in this case. "[I]t found that the agreement afforded a means by which both parties could have taken improper tax advantage of the federal and state governments, was entered into by both parties for tax purposes, was against public policy and should be treated as illegal. . . . It then concluded . . . the parties were *in pari delicto*, and that neither party was entitled to relief." (*Tri-Q, supra,* 63 Cal.2d. at p. 218.)

The Supreme Court disagreed and reversed. The court noted, "There is no doubt that the general rule requires the courts to withhold relief under the terms of an illegal contract or agreement which is violative of public policy." (*Tri-Q, supra*, 63 Cal.2d at p. 218.) But the court added, "These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract. They do not necessarily apply to both parties to the agreement unless both are truly *in pari delicto*." (*Ibid.*) The high court then adopted a formulation of the in pari delicto doctrine articulated in *Norwood v. Judd* (1949) 93 Cal.App.2d 276 [209 P.2d 24]. " '[T]he courts should not be so enamored with the Latin phrase "*in pari delicto*" that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.' " (*Tri-Q, supra*, 63 Cal.2d at pp. 218–219.) The *Tri-Q* court also relied upon its earlier statement of an exception to the general rule in *Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141, 151 [308 P.2d 713] where the court said: " 'In some cases, . . . effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.' " (*Tri-Q, supra*, 63 Cal.2d at p. 220.)

Applying this rationale to the case before it, the Supreme Court concluded: "[N]o reason appears why Satre should be denied the aid of the courts in obtaining the agreed consideration for the assets which he has delivered to Sta-Hi. Except for payment of that consideration, 'the transaction has been completed,' and the public requires no further protection. Sta-Hi is clearly guilty of the greater moral fault, and Satre's conduct involved little, if any, serious moral turpitude. Certainly, refusal of the courts to enforce the agreement would 'permit defendant [Sta-Hi] to be unjustly enriched at the expense of plaintiff.' Such a course would result in a forfeiture 'disproportionately harsh considering the nature of the illegality,' and the respective conduct of the parties. Finally, 'effective deterrence . . . [will be] best realized by enforcing plaintiff's [Satre's] claim rather than by leaving the defendant [Sta-Hi] in possession of the benefit.' " (*Tri-Q, supra*, 63 Cal.2d at p. 220, fns. omitted.)

The instant case cannot be distinguished from *Tri-Q* on any material basis. Yet the trial court ruled that "none of [the *Tri-Q*] exceptions appear before the Court in this case. Using the analysis contained in *Tri-Q Inc.*, Maudlin and Vasa were in *pari delicto*." The court below made a further finding "that at the time Vasa, Maudlin and the accountant, Anne Tahim, conceived and drafted the Trust, the goals and hoped for benefits differed between Maudlin and Vasa, but both were fully and intimately aware of the illegality, immorality and resultant benefits to themselves, respectively. Any other . . . finding would grant relief to the wrongdoer or wrongdoers."

■  As *Tri-Q* makes clear, however, mere knowledge by one party to a contract that the transaction is structured in a manner designed to achieve the unlawful purpose of the other party is not the beginning and the end of the inquiry. And with regard to the finding that Maudlin "conceived and drafted the Trust," we have searched the record for evidence to support the finding and are unable to find any. The PDSC defendants likewise have not directed us to any evidence in the record that would distinguish this case from *Tri-Q*. They point to the court's findings, but not to supporting evidence. The evidence PDSC does cite is the same type of evidence considered by the *Tri-Q* court, or, in some cases, is simply not germane to the asserted illegality.

■  For example the PDSC defendants point out that Maudlin testified it was his desire that "the payout . . . be over a period of time longer than my lifetime." But there is nothing immoral, illegal, or against public policy with respect to that request. And the PDSC defendants make much of Maudlin's deposition testimony wherein he was asked how much he was paid for his stock, and he answered, "I guess you'd say I was paid $2.9 million." Of course, that testimony is highly probative of the real purpose of the Secular Trust—to redeem Maudlin's stock. But the disguised stock redemption is the same type of conduct considered by the *Tri-Q* court. And, of course, the stock redemption itself is not illegal, immoral, or against public policy.[5] The PDSC defendants also rely on evidence that Maudlin and Vasa negotiated the price over a period of several months, but so did Satre in the *Tri-Q* case. Finally,

---

[5] "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599.) The disguised stock redemption had at least one lawful object, the redemption of Maudlin's stock. That the transaction was documented in a manner to facilitate false tax reporting suggests that PDSC's appropriate remedy is to correct the unlawful object of the contract by filing amended tax returns eliminating the false deduction, while honoring the lawful object of the contract by paying Maudlin for the stock he delivered. (See, e.g., *Homami v. Iranzadi* (1989) 211 Cal.App.3d 1104 [260 Cal.Rptr. 6] [oral agreement to pay interest on loan, contrary to written agreement stating loan was interest free, was tax evasion scheme and thus unenforceable, but payments were applied to principal of loan, the legal object of the contract].)

the PDSC defendants argue that Maudlin's "participation in this fraudulent scheme was exemplified by his attempt to obscure the truth about the Secular Trust in this litigation." But the *evidence* cited in support of this argument was *Vasa's* testimony, and the opening statement and closing argument of Maudlin's counsel in which he attempted to persuade the court the Secular Trust obligations were enforceable. ▉ But counsel's arguments are not evidence. And presenting an argument to achieve a result in litigation has nothing whatsoever to do with Maudlin's conduct at the time of the transaction some seven and one-half years earlier.

Maudlin's *actual* testimony is instructive. "Q. What was the extent of your involvement in determining the form of the secular trust? [¶] A. Very little. [¶] Q. What was your involvement, if any? [¶] A. I really don't recall. I just don't recall. [¶] Q. Was the—did you say to Mr. Vasa that you wanted a secular trust as opposed to some other form of compensation? [¶] A. No, I'm sure I didn't. [¶] Q. Did you know what a secular trust was at that time? [¶] A. No. [¶] Q. Did you rely on the company and its professionals to come up with the appropriate form for this agreement? [¶] A. Pretty much, to the best of my knowledge, that's true. [¶] Q. Were you represented by counsel in that matter? [¶] A. No, I was not. [¶] Q. Did you have any professionals representing you of any type? [¶] A. No, I did not." On cross-examination, Maudlin confirmed this testimony. "Q. Whose idea was it—well, let me ask it this way: It was Hark Vasa's idea to buy back your stock; correct? [¶] A. Yes. [¶] Q. And it was his idea to enter into this secular trust agreement; correct? [¶] A. It was his suggestion. [¶] Q. That wasn't something that you came up with. [¶] A. No."

Vasa and Tahmin also confirmed Maudlin's lack of involvement. Essentially, Vasa went to Tahmin and asked for advice on how the payments to Maudlin could be structured in a tax-advantaged manner, and Tahmin recommended and drafted the Secular Trust.

Maudlin also testified he had paid taxes on all his payments from 1997 to 2003 as ordinary income. Of course, his tax burden would have been significantly lower had he reported the stock redemption as an installment sale at capital gain tax rates. (See 26 U.S.C. § 453.) On the other side of the transaction, PDSC had the tax advantage of deducting the payments on its tax return. It paid too little tax—Maudlin paid too much.

▉ On this record, we cannot distinguish *Tri-Q*. As in *Tri-Q*, Maudlin has fully performed his side of the transaction and the public requires no further protection. PDSC was clearly guilty of the greater moral fault. Maudlin's

conduct involved little, if any, serious moral turpitude. And importantly, a refusal to enforce the agreement would result in a forfeiture, according to the evidence, having a present value of $1,696,002 as of September 1, 2004. Meanwhile, the PDSC defendants have received *all* of Maudlin's stock, which their own expert valued at approximately $2.9 million. The magnitude of the forfeiture on Maudlin's side of the transaction and the unjust enrichment on the PDSC defendants' side is staggering.

We conclude Maudlin is not in pari delicto with PDSC and Vasa, and could have enforced the Secular Trust obligations against PDSC, a California corporation. The remaining issue is whether he may enforce these obligations against PDSC, a Delaware corporation, a subject to which we now turn.

*PDSC, a Delaware Corporation, Is Liable as the Successor by Merger to PDSC, a California Corporation*

█ The PDSC defendants assert they are "innocent" parties, enjoying a status like a bona fide purchaser for value without notice, a characterization the court implicitly adopted. But there is no authority for this proposition. The effect of a statutory merger is set forth in Corporations Code section 1107, subdivision (a): "Upon merger pursuant to this chapter the separate existence of the disappearing corporations ceases and the surviving corporation shall succeed, without other transfer, to *all* the rights and property of each of the disappearing corporations and shall be subject to *all the debts and liabilities of each in the same manner as if the surviving corporation had itself incurred them.*" (Italics added.) In short, PDSC, a Delaware corporation, has the same obligation as does PDSC, a California corporation, "as if [the Delaware corporation] had itself incurred" the obligation. If PDSC, a California corporation, would have been liable to Maudlin, so too would PDSC, a Delaware corporation. (See, e.g., *Treadaway v. Camellia Convalescent Hospitals, Inc.* (1974) 43 Cal.App.3d 189 [118 Cal.Rptr. 341] [surviving corporation in statutory merger is subject to reformation of one of its assumed contracts as if it had been the original party to the contract].) Cases cited by the PDSC defendants suggesting the contrary are all inapt as they do not involve a statutory merger, but instead discuss the rights of a bankruptcy trustee or the transferee of a fraudulent conveyance. If there was any fraud or concealment in connection with the merger, the PDSC defendants' remedy, if any, is against those who participated in the merger. Maudlin did not.

*Remedy on Remand*

■ As we have explained, neither the consideration for, nor the primary object of, the (disguised) stock redemption agreement is unlawful. But the law nevertheless restricts the conditions under which each payment may be made. Maudlin's entitlement to each payment of cash as it becomes due is dependent upon PDSC's having sufficient retained earnings at the time of payment. Thus, any deficiency in the amount of PDSC's retained earnings would make its performance at least temporarily impossible. But a "[t]emporary impossibility usually *suspends* the obligation to perform during the time it exists." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 833, p. 921.) The obligation to perform is not excused or discharged by a temporary impossibility—it is merely suspended—unless the delayed performance becomes materially more burdensome or the temporary impossibility becomes permanent. (*G.W. Andersen Construction Co. v. Mars Sales* (1985) 164 Cal.App.3d 326, 334–337 [210 Cal.Rptr. 409] [governmentally imposed construction moratorium did not discharge obligation of general contractor affected by moratorium, but merely suspended its duty where delayed performance would not have been materially more burdensome].)

California law on temporary impossibility mirrors the Restatement Second of Contracts, section 269, which provides: "Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration."[6] On the other hand, "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." (Rest.2d Contracts, § 261.)

Thus, on remand, the court must determine whether PDSC had sufficient retained earnings to meet the section 500 test at the time each $10,000 payment became due, beginning with the missed payment in June 2003 through the month of the new trial, and, if the test is not met when a payment became due, determine whether the deficiency was temporary, thereby merely

---

[6] "The Second Restatement consolidates the subjects of impracticability and frustration of purpose, substituting the term 'impracticability' for 'impossibility' as better expressing the extent of the increased burden required." (1 Witkin, *supra*, Contracts, § 829, p. 917.)

suspending the duty to pay, or whether, without fault of PDSC, the deficiency has become sufficiently permanent to excuse further payments. The court may consider the evidence already in the record, together with such additional evidence as it may deem necessary or advisable to receive.[7]

█ Judgment, however, may be entered only for the accrued, unpaid installments not suspended by the operation of section 500—not for the present value of the future income stream. Maudlin's theory of anticipatory breach of contract argued at the first trial is inapplicable to the installment obligation created by this stock redemption agreement. It is well established in California law that, in the absence of an acceleration clause, a contract made unilateral by one party's complete performance renders the doctrine of anticipatory breach inapt. (See *Cobb v. Pacific Mutual Life Ins. Co.* (1935) 4 Cal.2d 565, 571 [51 P.2d 84] (*Cobb*); *Minor v. Minor* (1960) 184 Cal.App.2d 118, 122 [7 Cal.Rptr. 455]; *Diamond v. University of So. California* (1970) 11 Cal.App.3d 49, 53–54 [89 Cal.Rptr. 302]; *Harris v. Time, Inc.* (1987) 191 Cal.App.3d 449, 457–458 [237 Cal.Rptr. 584].) While this rule has been criticized (see, e.g., *Harris v. Time, Inc., supra*, 191 Cal.App.3d at pp. 457–458), we are bound by our Supreme Court's holding in *Cobb*. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.) Maudlin may recover all payments that are owed through the time of trial, but must await default on the future installments before bringing an action for nonpayment. (*Minor v. Minor, supra*, 184 Cal.App.2d at p. 126.)

Finally, because the court found the transaction unenforceable by Maudlin, it made no other findings on his other causes of action. Accordingly, on remand, the court must also make findings on Maudlin's remaining causes of action against PDSC and ADS.[8]

---

[7] As described in footnote 4, *ante*, we are aware of evidence in the record that would circumstantially support a finding that PDSC had sufficient retained earnings to make all payments to Maudlin through at least May 2004. But, as noted, the appellate record does not contain all of the evidence from the original trial, and the required factual findings are properly made by the trial court in the first instance. Moreover, a proper determination of the amount of retained earnings will likely require a restatement of PDSC's financial statements to account for the effect on its retained earnings of treating the payments to Maudlin as a stock redemption, thereby eliminating their deduction as an ordinary business expense, and accounting for the additional tax burden on PDSC.

[8] Maudlin made no argument on appeal with regard to his claims against Vasa, and Vasa did not appear in this appellate proceeding. Because no error has been affirmatively shown, the judgment as to Vasa is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].)

## DISPOSITION

The judgment is reversed and remanded with directions to the trial court to determine the amount owing to Maudlin under the Secular Trust through the date of the new trial, in a manner consistent with the views expressed in this opinion. Further, the trial court must make a new decision on Maudlin's remaining causes of action against PDSC and ADS. In making its determinations, the trial court may utilize the evidence presented at the original trial, together with such additional evidence as the court may deem necessary and proper to receive. Maudlin shall recover his costs on appeal.

Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 12, 2006, S143114.