Filed 2/16/24  Fitness International v. Andrews Rancho Del Sur CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| FITNESS INTERNATIONAL, LLC, | B325595 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 20STCV43366 |
| v. | |
| ANDREWS RANCHO DEL SUR, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Timothy Patrick Dillon, Judge.  Affirmed.

Klehr Harrison Harvey Branzburg, A. Grant Phelan, Mary Ellen O'Laughlin; Freeman, Freeman & Smiley, Saul Ewing and Dawn B. Eyerly for Plaintiff and Appellant.

Ferruzzo & Ferruzzo, Gregory J. Ferruzzo and Sean E. Morrissey for Defendant and Respondent.

_____

Plaintiff Fitness International, LLC (Fitness) appeals a summary judgment in favor of defendant Andrews Rancho Del Sur (Andrews) on Fitness's complaint to recover rent payments made under protest during the months when state and local closure orders responding to the COVID-19 pandemic prevented Fitness from operating its indoor health club. Fitness contends the orders excused its obligation to pay rent under both the terms of the parties' lease and the frustration of purpose doctrine. We conclude otherwise and affirm.

## BACKGROUND

Fitness operates indoor health clubs nationwide in properties leased from commercial landlords, such as Andrews. Andrews owns a shopping center located in Downey.

In December 1999, Fitness entered into an agreement with Andrews to lease an approximately 41,000 square foot building in the shopping center. The lease required Fitness to construct the building and outfit it for use as a health club. In 2005, the parties executed an amendment to the lease, authorizing Fitness to add another 11,800 square feet of space to the building. The lease provides for a 15-and-a-half-year term plus three five-year extension options.

In March 2001, the city of Downey issued Fitness a certificate of occupancy permitting it to use the premises as a health club and fitness facility. Since then, Fitness has used the leased premises solely for this purpose.

In March 2020, the Governor proclaimed a state of emergency in California and issued a set of related executive orders to address the public health threat posed by COVID-19. One order instituted a moratorium on residential and commercial evictions for nonpayment of rent, while expressly declaring that

"[n]othing" in the order "shall relieve a tenant of the obligation to pay rent, nor restrict a landlord's ability to recover rent due." Another order directed all California residents to stay home, with certain exceptions, and directed all non-essential businesses to stop operating immediately.

Consistent with the Governor's executive order, on March 16, 2020, the County of Los Angeles Department of Public Health issued an order requiring the closure of "Gyms and Fitness Centers" within Los Angeles County, including Fitness's health club. The next day Fitness ceased all health club operations at the leased premises and froze membership dues.

Over the course of the following year, Fitness was periodically allowed to reopen its doors to the public for brief periods of time and at limited capacity. On June 15, 2021, it was finally able to return to normal operations.

Fitness did not vacate or surrender possession of the leased premises during the closure period. Nor did it attempt to terminate the lease. Instead, Fitness exercised an option to extend the lease for five years, effective September 2020. It also kept its equipment on the premises during the closure period and requested permission to install three electric car charging stations in the parking area.

During the closure period, Andrews sent Fitness eight default notices for nonpayment of rent. Fitness paid the rent under protest, reserving all rights and remedies with respect to the payments.

Fitness sued Andrews to recover the rent paid under protest. Among other things, the complaint asserted causes of action for breach of contract and a common count for money had and received.

Andrews moved for summary judgment. It argued the lease unambiguously obligated Fitness to pay rent in exchange for Andrews leasing the premises to Fitness. Fitness opposed the motion, arguing Andrews had guaranteed Fitness the right to use the premises as a health club and its obligation to pay rent was therefore excused during the period that Andrews was in breach of this guarantee. Fitness also argued the doctrines of impossibility and impracticability excused its performance.

The trial court agreed with Andrews and entered judgment in its favor. Fitness timely appealed.

## DISCUSSION

### 1.  *Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A summary judgment motion must be granted " 'if all the papers submitted show' that 'there is no triable issue as to any material fact' . . . and that the 'moving party is entitled to a judgment as a matter of law.' " (*Ibid.*)

In an appeal from a summary judgment, "[w]e review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) We will affirm a summary judgment if it is correct on any of the grounds asserted in the

4

moving party's motion.  (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 747–748.)

**2.** ***The Lease Does Not Excuse Fitness from Paying Rent During the Government-Ordered Closure Period***

Fitness contends its "obligation to pay rent was conditioned on [Andrews's] constant, repetitive, and repeatable obligation to Fitness that Fitness could use and enjoy the Premises for a health club and fitness facility every month, throughout the term of the Lease."  It argues Andrews "breached" this obligation during the COVID-19 closure periods, when Fitness was temporarily prohibited from legally operating as a health club. While this purported breach persisted, Fitness maintains its obligation to pay rent under the lease was abated.  We disagree.

Section 2.2 of the lease sets forth Andrews's representations and warranties as landlord.  Those include representations about Andrews's authority to conduct business, its title to the premises, its compliance with "applicable laws . . . in effect as of the Commencement Date" of the lease, and its obligation to deliver the premises to Fitness free of latent or patent defects.  None of these representations or warranties makes any mention of Fitness's health club operations or of the parties' obligations to comply with applicable laws after the lease's commencement date.

Fitness nonetheless contends Andrews's purported obligation to ensure the premises could be legally used as a health club throughout the lease term is set forth in section 1.9 of the lease, titled "Initial Uses," which provides:

> "The 'Initial Uses' of the Building shall be for the operation of a health club and fitness facility . . . .  As part of the health club and

5

fitness facility operated on the Premises, Tenant may use portions of the Premises for uses ancillary to a health club and fitness facility . . . . So long as Tenant (or its successor or assigns) is operating as a health club and fitness facility, Tenant (or its successor or assigns) shall have the right throughout the Term and all Option Terms to operate for uses expressly permitted under this Lease and Landlord will not allow any other fitness related operation . . . to operate in the Shopping Center."

Although the word "guarantee" is nowhere to be found in the provision, Fitness nonetheless argues the reference to its "right 'to operate' " in section 1.9 constitutes "a guarantee . . . that its purpose for entering into the Lease—the right to operate a health club and fitness facility—would at all times be fulfilled." Because there plainly is no express guarantee of this sort in section 1.9 or anywhere else in the lease, Fitness necessarily asks us to imply one. There is no basis to do so. As we will explain, because the lease states the parties' obligations completely—specifically with respect to compliance with legal regulations and restrictions—we cannot imply a covenant making Andrews liable for regulations that temporarily rendered Fitness's use of the premises illegal.

Implied covenants generally are not favored because courts recognize we "cannot make better agreements for parties than they themselves have been satisfied to enter into." (*Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co. Sales Division* (1964) 228 Cal.App.2d 810, 815 (*Walnut Creek Pipe*); *Cousins Inv. Co. v.*

*Hastings Clothing Co.* (1941) 45 Cal.App.2d 141, 143.) Judicial authority to insert implied covenants is therefore subject to many strict rules of construction, including that " 'there can be no implied covenant where the subject is completely covered by the contract.' " (*Lippman v. Sears Roebuck & Co.* (1955) 44 Cal.2d 136, 142 [listing rules governing implied covenants].) Nor may an implied covenant be drawn from the mere recital of facts that do not express a promise or agreement. On the contrary, the law requires some clear statement in the contract from which the court may reasonably infer the party to be charged with an implied obligation intended to assume liability for it. (See *O'Sullivan v. Griffith* (1908) 153 Cal. 502, 506; see, e.g., *McArthur v. Goodwin* (1916) 173 Cal. 499, 505.)

Under these rules, we cannot *imply* a covenant making Andrews liable for government orders that temporarily rendered Fitness's use of the premises illegal, because Fitness *expressly* covenanted that it would ensure its uses of the premises were lawful. Section 8.3 of the lease provides: "Tenant [Fitness] hereby covenants to Landlord [Andrews] that, during the Term of the Lease and for so long thereafter as Tenant occupies the Premises, Tenant shall . . . (e) not use or allow the Premises to be used for any illegal purposes." Consistent with that covenant, section 8.1 states: "If any governmental license(s) or permit(s) shall be required for the proper and *lawful* conduct of Tenant's business or other activity carried on in the Premises, or if a failure to procure such a license or permit might or would in any way adversely affect Landlord or the Premises, then *Tenant*, *at Tenant's expense*, shall duly procure and thereafter maintain such license(s) or permit(s) and submit the same for inspection by Landlord." (Italics added.) In view of Fitness's express covenants

7

that it would not use the premises for an illegal purpose and that it would take measures necessary to ensure it could conduct its business in a "proper and lawful" manner during the lease term, we cannot imply a covenant making Andrews liable for the temporary illegality of Fitness's operation. (See, e.g., *SVAP III Poway Crossings, LLC v. Fitness International, LLC* (2023) 87 Cal.App.5th 882, 891 (*Poway Crossings*) [landlord's express covenant and warranty that, " '*as of the Effective Date*, Tenant's Initial Uses of the Premises will not violate any applicable rule, regulation, requirement or other law of any governmental agency . . . *applicable as of the date hereof* " precluded implied covenant requiring landlord "to make that guarantee throughout the term of the lease" (italics added)].)

Fitness suggests its express covenants have no bearing on its rights or obligations under the lease because, with or without the covenants, "[n]o one is privileged to use any property for unlawful purposes." We are not persuaded. As Fitness itself emphasizes, a fundamental rule of contract interpretation directs that, to the extent practicable, a contract must be read as a whole, with individual clauses helping to interpret others, so as to give effect to all provisions and to avoid rendering some meaningless. (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027, citing Civ. Code, § 1641; accord *Poway Crossings, supra,* 87 Cal.App.5th at p. 891.) Consistent with this principle, Fitness's "right . . . to operate for uses *expressly permitted*" under the lease must be read together with its express covenants, which necessarily limit the scope of this "right" to only *lawful* uses. (Italics added.) More to the point, the broad reference to Fitness's "right" to operate in section 1.9 cannot be read to impose an implied obligation on Andrews to bear the risk

8

that Fitness's operations could be rendered illegal, because the express covenants in sections 8.1 and 8.3 unambiguously allocate the relevant obligations and attendant risks of illegality to Fitness.

Fitness insists that, in entering the lease and making substantial improvements to the property, it plainly intended to operate a health club on the premises throughout the lease term.[1] That may be true, but neither that purpose nor the possibility that Fitness's investment might lose value is sufficient to imply a covenant making Andrews the guarantor of those operations. "It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity." (*Walnut Creek Pipe, supra,* 228 Cal.App.2d at p. 815.) As discussed, the lease expressly assigns to Fitness the obligation

---

[1] As Andrews points out, the express terms of the lease give reason to doubt Fitness's claim that it intended to use the premises only as a fitness facility throughout the lease term. Specifically, section 1.9 provides that Fitness's " 'Initial Uses' " of the premises "shall be for the operation of a health club and fitness facility," while section 8.1 requires Fitness to open for business on the premises for only "one (1) day for the Initial Uses set forth in Section 1.9." Section 8.2 in turn provides that, "[f]ollowing such initial opening for business . . . , [Fitness] shall have the right to change the use of the Premises to any alternate lawful use which is not otherwise prohibited." The fact that Fitness bargained for this right casts doubt on its contention that it never anticipated changing its use of the premises, as circumstances might demand.

9

to ensure it uses the premises for only lawful operations, and this obligation necessarily carries with it the attendant risk that those operations could be rendered illegal during the lease term. There is no obvious necessity for the covenant that Fitness asks us to imply here.

Rejecting this implied covenant does not render section 1.9 illusory or meaningless. At its core, the fundamental bargain embodied in the lease is Andrews's promise to grant Fitness possession of the premises in exchange for Fitness's promise to pay rent to Andrews.[2] Consistent with that bargain, we can reasonably infer that, in recognizing Fitness "shall have the right throughout [the lease term] to operate for uses expressly permitted," Andrews implicitly covenanted not to interfere with Fitness's permitted uses of the premises. As the trial court recognized, this implied covenant is consistent with Andrews's central promise to grant Fitness possession of the premises and accords with Andrews's express covenant in the last clause of section 1.9 "not [to] allow any other fitness related operation . . . to operate in the Shopping Center," "[s]o long as [Fitness] is operating as a health club and fitness facility." There is no evidence that Andrews interfered with Fitness's possession or

---

[2] These mutual promises are plainly set forth in section 2.1, which reads: "In consideration of the rents agree[d] to be paid and of the covenants and agreements made by the respective parties hereto, Landlord hereby demises and leases to Tenant and Tenant hereby leases from Landlord the Premises, upon the terms, conditions and provision set forth in this Lease." Critically, nothing in this section or any other provision of the lease expressly ties Fitness's obligation to pay rent to the operation of a fitness center or any other particular type of operation on the premises.

10

use of the premises.  The trial court did not err in concluding Fitness had an obligation to pay rent under the lease, notwithstanding the disruption to its operations occasioned by the COVID-19 closure orders.

3.     ***Fitness's Obligation to Pay Rent Was Not Excused Due to a Temporary Frustration of Purpose***

Fitness contends the frustration of purpose doctrine temporarily excused its obligation to pay rent during the closure periods.  We disagree.  As our colleagues in Division Seven recently explained, the frustration of purpose doctrine does not excuse Fitness from its obligation to pay rent because Fitness did not attempt to rescind the lease but instead remained in possession of the premises.  (*KB Salt Lake III, LLC v. Fitness International, LLC* (2023) 95 Cal.App.5th 1032, 1057 (*Salt Lake*).)

"The doctrine of frustration excuses contractual obligations where ' "[p]erformance remains entirely possible, but the whole value of the performance to one of the parties at least, and the basic reason recognized as such by *both* parties, for entering into the contract has been destroyed by a supervening and unforeseen event." ' [Citation.]  A party seeking to escape the obligations of its lease under the doctrine of frustration must show: (1) the purpose of the contract that has been frustrated was contemplated by *both* parties in entering the contract; (2) the risk of the event was not reasonably foreseeable and the party claiming frustration did not assume the risk under the contract; and (3) the value of counterperformance is totally or nearly totally destroyed.  [Citations.]  Governmental acts that merely make performance unprofitable or more difficult or expensive do not suffice to excuse a contractual obligation." (*Poway Crossings, supra,* 87 Cal.App.5th at p. 895; *Salt Lake, supra,* 95 Cal.App.5th

at p. 1056; see *Lloyd v. Murphy* (1944) 25 Cal.2d 48, 55; *Dorn v. Goetz* (1948) 85 Cal.App.2d 407, 410–413.)  Where the doctrine applies, "the 'legal effect . . . is the immediate termination of the contract.' " (*Poway Crossings,* at p. 896; *Salt Lake,* at p. 1056; see *Johnson v. Atkins* (1942) 53 Cal.App.2d 430, 434–435; see also *20th Century Lites v. Goodman* (1944) 64 Cal.App.2d Supp. 938, 945 [" 'frustration brings the contract to an end forthwith' "].)

"At least two courts have held California law does not recognize 'temporary' frustration of purpose, which ostensibly excuses a party's performance under a contract temporarily until the cause of the frustration abates." (*Salt Lake, supra,* 95 Cal.App.5th at p. 1056, citing *Poway Crossings, supra,* 87 Cal.App.5th at p. 896; *20th Century Lites v. Goodman, supra,* 64 Cal.App.2d Supp. at p. 945.)  As the *Salt Lake* court explained, "[t]his conclusion follows from the legal effect of the frustration doctrine, which terminates the contract." (*Salt Lake,* at p. 1056; *Poway Crossings,* at p. 896; *20th Century Lites,* at p. 945.)[3]

---

[3]    Fitness cites *Maudlin v. Pacific Decision Sciences Corp.* (2006) 137 Cal.App.4th 1001 and *Bergin v. van der Steen* (1951) 107 Cal.App.2d 8 for the proposition that California law does recognize temporary frustration of purpose.  As the *Salt Lake* court explained, *Maudlin* does not support the proposition because the case addressed the doctrine of temporary impossibility or impracticability—not temporary frustration of purpose. (See *Maudlin,* at p. 1017; *Salt Lake, supra,* 95 Cal.App.5th at p. 1056.)  Similarly, in *Bergin,* although the reviewing court used the term "temporary frustration," it is clear from the facts of the case that the court addressed what amounted to a temporary impossibility. (*Bergin,* at p. 16.) The contract in *Bergin* required one party to pay the equivalent of two-and-a-half percent of its gross sales from a concession at a racetrack to the other party as a commission. (*Id.* at p. 10.)

Ultimately, the *Salt Lake* court found no need to decide the issue because, regardless of whether our state law embraces the temporary frustration of purpose doctrine, it would not excuse Fitness from its obligation to pay rent as Fitness "did not attempt to rescind the lease and instead remained in possession of the premises." (*Salt Lake, supra,* 95 Cal.App.5th at p. 1057.) We reach the same conclusion for the same reason. As the court in *Grace v. Croninger* (1936) 12 Cal.App.2d 603 explained, "even where the sole business to which premises are restricted by the terms of a lease becomes unlawful, the lease is not terminated merely by the enactment of the law declaring such business unlawful, but liability under the lease continues as long as the lessee continues in possession." (*Id.* at p. 606.) The *Grace* court relied on the Supreme Court's reasoning in *Industrial Development & Land Co. v. Goldschmidt* (1922) 56 Cal.App. 507, where, in denying rehearing, our high court stated a lessee could not "continue to hold possession of the premises after the prescribed business became unlawful, and escape payment of the rent on the ground of such illegality, without surrendering to the lessor." (*Id.* at p. 512; see *Grace,* at p. 606; *Salt Lake,* at pp. 1057–1058.)

Here, the undisputed facts show Fitness remained in possession of the premises, storing its equipment in the building and requesting permission to install three electric car charging

---

However, in 1942 to 1944, wartime government regulations forbade race meets, which rendered it impossible for the concession to make any sales at the racetrack and, thus, impossible to pay the commission. (*Id.* at p. 13.) That plainly is not the case here, as the undisputed facts show Fitness was able to pay rent under its lease with Andrews during the closure period, albeit under protest.

stations in the parking area, in anticipation of the closure orders being lifted.  Thus, even if California law recognized temporary frustration of purpose, Fitness was still obligated to make rent payments under the lease for the time it remained in possession of the premises.  (See *Salt Lake, supra,* 95 Cal.App.5th at p. 1058.)

## DISPOSITION

The judgment is affirmed.  Defendant Andrews Rancho Del Sur is entitled to costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.