Filed 9/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FITNESS INTERNATIONAL, LLC, <br><br> Defendant and Appellant, <br><br> v. <br><br> KB SALT LAKE III, LLC, <br><br> Plaintiff and Respondent. | B320562 <br><br> (Los Angeles County Super. Ct. No. 21CHCV00790) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Melvin D. Sandvig, Judge. Affirmed.

Dorsey and Whitney, Bryan M. McGarry, Lynnda A. McGlinn, and Jill A. Gutierrez; Elenoff, Grossman & Schole and Bryan M. McGarry for Defendant and Appellant.

Loeb and Loeb, Thomas E. Lombardi and Matthew C. Anderson for Plaintiff and Respondent.

# INTRODUCTION

Fitness International, LLC was operating an indoor gym and fitness center in the Los Angeles neighborhood of Chatsworth in 2016 when it entered into an amended lease with KB Salt Lake III, LLC that required Fitness International to renovate the premises. Construction began in November 2019 and was expected to be completed in August 2020. In March 2020, however, the COVID-19 pandemic prompted government orders that closed indoor gyms but that allowed commercial construction to continue. Fitness International nevertheless stopped construction at the Chatsworth site, remained in possession of the premises, and stopped paying rent. KB Salt Lake filed this unlawful detainer action, and the trial court granted KB Salt Lake's motion for summary judgment and entered judgment in its favor.

Fitness International asserted various arguments and affirmative defenses that rested, at least in part, on its contention the state and local COVID-19 closure orders did not allow commercial construction, like the renovation Fitness International was making to the gym, to continue. The trial court rejected Fitness International's arguments and ruled the closure orders did not prevent Fitness International from continuing construction work at the Chatsworth site. We agree with the trial court's interpretation of the COVID-19 closure orders and reject the arguments by Fitness International that rely on the lease's force majeure provision and the doctrines of frustration of purpose and temporary impossibility and impracticability. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.   *Fitness International Leases the Premises for an Indoor Gym*

Fitness International acquired a lease for the premises in Chatsworth from another fitness company in 2011. In November 2016 Fitness International and KB Salt Lake entered into an amended lease agreement for a term of approximately 11 years, with options to renew for up to 20 additional years. The lease defined the "'Primary Uses'" of the premises as "the operation of a health club and fitness facility."

A rent schedule set the monthly base rent at $11,850 until the end of 2016 and increased the base rent each year throughout the term of the lease. In exchange for the rent payments, KB Salt Lake leased the premises to Fitness International "subject to the terms, conditions and provisions set forth in [the lease]," including the provision that, "[s]ubject to all applicable laws," Fitness International "shall have the right throughout the Term to operate the Premises, or any portion thereof, for uses permitted under [the lease]." KB Salt Lake also agreed to indemnify Fitness International from and against losses, costs, and expenses "arising as a result of any inaccuracy or breach of any representation, warranty or covenant" by KB Salt Lake in the lease.

The lease required Fitness International to renovate and expand the existing gym according to a "Work Letter" attached to the lease. The Work Letter required Fitness International to begin the "Tenant's Work" within 20 business days after obtaining a building permit and to "proceed with due diligence thereafter."

3

The lease included a force majeure provision at section 22.3, which stated: "If either party is delayed or hindered in or prevented from the performance of any act required hereunder because of strikes, lockouts, inability to procure labor or materials, retraction by any Government Authority of the Building Permit . . . once it has already been issued, failure of power, restrictive laws, riots, insurrection, war, fire, inclement weather or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed, financial inability excepted (each, a 'Force Majeure Event'), subject to any limitations expressly set forth elsewhere in this Lease, performance of such act shall be excused for the period of delay caused by Force Majeure Events and the period for the performance of such act shall be extended for an equivalent period (including delays caused by damage and destruction caused by Force Majeure Events). Delays or failures to perform resulting from lack of funds or which can be cured by the payment of money shall not be Force Majeure Events. Force Majeure Events shall also include, without limitation, hindrance and/or delays in the performance of Tenant's Work or Tenant obtaining certificates of occupancy or compliance for the Premises by reason of any of the following (i) any work performed by Landlord in or about the Project from and after the Effective Date . . . ; and/or (ii) the existence of Hazardous Substances in, on or under the Project not introduced by Tenant."

B. *The COVID-19 Pandemic Temporarily Shuts Down Indoor Gyms, and Fitness International Invokes the Force Majeure Provision*

Fitness International obtained a building permit to renovate the premises and commenced construction in November 2019.  At that time Fitness International closed the gym that was operating on the premises and continued paying rent to KB Salt Lake.  Fitness International estimated that construction would last approximately eight months and that the newly renovated gym would open sometime in August 2020.

In March 2020 the Governor of California proclaimed a state of emergency based on the COVID-19 outbreak.  On March 12, 2020 the Governor issued executive order N-25-20, which provided, "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."  (Governor's Exec. Order No. N-25-20, § 1 (Mar. 12, 2020).)  On March 16, 2020 the Los Angeles County Public Health Officer issued an order requiring the immediate closure of "[g]yms and fitness centers." (Los Angeles County Dept. of Public Health, Order of the Health Officer, § 4 (Mar. 16, 2020).)  On March 19, 2020 the Governor issued executive order N-33-20 requiring all California residents to stay home "except as needed to maintain continuity of operations of the federal critical infrastructure sectors . . . ." (Governor's Exec. Order No. N-33-20, § 1 (Mar. 19, 2020).)[1]

---

[1]     The federal critical infrastructure sectors included "Commercial Facilities."  (See Cybersecurity & Infrastructure Security Agency, Identifying Critical Infrastructure During

5

Executive Order N-33-20 gave the state public health officer authority to identify additional sectors as critical to protecting the health and well-being of Californians.  (*Ibid.*)

Also on March 19, 2020 the Mayor of Los Angeles issued a "Safer at Home" order that stated, "Wherever feasible, City residents must isolate themselves in their residences, subject to certain exceptions provided below."  (Los Angeles Public Order Under City of Los Angeles Emergency Authority (Mar. 19, 2020).)  Those exceptions allowed residents to leave their homes to engage in certain activities, including to "perform any work necessary to the operations, maintenance and manufacturing of essential infrastructure, including without limitation construction of commercial and institutional buildings, residential buildings and housing, . . . provided that they carry out those services and [they] work in compliance with social distancing practices as prescribed by the Centers for Disease Control and Prevention and the Los Angeles County Department of Public Health, to the extent possible."  (*Id.*, § 5(ix) ["Essential Infrastructure"].)  The City revised and extended this order on May 27, 2020.  (Los Angeles Public Order Under City of Los Angeles Emergency Authority (May 27, 2020).)  The revised order continued to allow "[i]ndividuals [to] leave their residences to provide any services or goods or perform any work necessary to build, operate, maintain or manufacture essential infrastructure, including without limitation construction of public health

COVID-19 <https://www.cisa.gov/topics/risk-management/coronavirus/identifying-critical-infrastructure-during-covid-19> [as of Sept. 26, 2023], archived at <https://perma.cc/GWU2-HLAV>.)

operations, commercial, office and institutional buildings, residential buildings and housing."

On March 21, 2020 the Los Angeles County Public Health Officer issued the "Safer at Home Order for Control of COVID-19."  This order extended the closure of non-essential businesses, including gyms and fitness centers, to April 19, 2020 and allowed "Essential Businesses" to continue operations with certain precautions to prevent the spread of COVID-19. (Los Angeles County Dept. of Public Health, Order of the Health Officer, §§ 2, 3(f)(ii) (Mar. 21, 2020).)  "Essential Businesses" included "Construction Workers who support the construction, operation, inspection, and maintenance of construction sites and construction projects (including housing construction)."  (*Id.*, § 13(x).)  The order did not prevent residents from leaving their homes "to perform any work necessary or provide services to . . . Essential Infrastructure," such as "construction of commercial, office, and institutional buildings."  (*Id.*, § 15(b).) Subsequent orders of the Los Angeles County Public Health Officer extended the Safer at Home Order and continued the closure of gyms and fitness centers through June 11, 2020.  Each of these orders continued to exempt commercial construction from the Safer at Home Order as an "Essential Business."[2]  (We refer to the Safer at Home Orders issued by the City and County of Los Angeles, collectively, as the "COVID-19 closure orders.")

---

[2]  The Los Angeles County orders extending the effective date of the Safer at Home Order did not include "construction of commercial, office, and institutional buildings" as "Essential Infrastructure," but continued to include commercial construction in the definition of "Essential Business."

7

On June 12, 2020 the Los Angeles County Public Health Officer issued an order permitting gyms and fitness centers to reopen, but a month later the County closed them again. On March 15, 2021 the County Public Health Officer allowed gyms and fitness centers to reopen at limited capacity, and on June 11, 2021 the Governor's Executive Order N-07-21 ended restrictions on all sectors. (Los Angeles County Dept. of Public Health, Order of the Health Officer, § 9.5(c) (Mar. 15, 2021); Governor's Exec. Order No. N-07-21, §§ 1-2 (June 11, 2021).)

Meanwhile, Fitness International notified KB Salt Lake on March 20, 2020 that certain "COVID-19-Related Occurrences" constituted a force majeure event under section 22.3 of the lease. Specifically, Fitness International claimed "delays in obtaining governmental inspections, entitlements, permits and/or approvals, restrictive laws, Tenant's inability to procure labor or materials and other delay/hindrance-causing occurrences beyond the reasonable control of Tenant that are the result of and/or associated with the global and national emergency caused by the spread of COVID-19" were "COVID-19-Related Occurrences" that excused Fitness International from performing its "pre-opening and development/construction-related obligations" under the lease "for the period of delay caused by the COVID-19-Related Occurrences." Fitness International stopped paying rent beginning with the April 2020 payment and never resumed.

C. *KB Salt Lake Files This Unlawful Detainer Action, and the Trial Court Grants KB Salt Lake's Motion for Summary Judgment*

On September 10, 2021 KB Salt Lake served Fitness International with a notice of potential event of default. The

8

notice stated Fitness International would be in default unless within 10 days it paid the then-delinquent rent amount of $336,707.63. On September 30, 2021, after Fitness International failed to make the requested payment, KB Salt Lake served Fitness International with a five-day notice to pay $239,598.35 in rent or quit the premises.[3] The notice stated that, if Fitness International failed to pay the sum due within five days, KB Salt Lake would take legal action to terminate and forfeit the lease and recover possession of the premises. Fitness International did not make a rent payment by October 6, 2021, and KB Salt Lake filed this action for unlawful detainer on October 7, 2021. Fitness International answered and admitted it remained in possession of the premises.

Following discovery, KB Salt Lake moved for summary judgment, arguing there were no triable issues of material fact on the elements of its cause of action for unlawful detainer or on five affirmative defenses Fitness International identified in its discovery responses. First, KB Salt Lake argued Fitness International's defense based on force majeure did not apply because the lease excluded from the definition of "'Force Majeure Events'" any "'[d]elays or failures to perform resulting from lack of funds or which can be cured by the payment of money.'" KB Salt Lake argued the only breach alleged in the unlawful detainer action was failure to pay rent, which Fitness International could cure by making a payment of money. KB Salt

---

[3]     The amount of rent due was adjusted to reflect the one-year limitation on recovering back rent in actions for unlawful detainer. (See Code Civ. Proc., § 1161, subd. 2; *Levitz Furniture Co. v. Wingtip Communications, Inc.* (2001) 86 Cal.App.4th 1035, 1041.)

9

Lake also argued Fitness International had the funds to pay rent and could not blame the COVID-19 closure orders for failing to make rent payments. Finally, KB Salt Lake argued the force majeure clause did not apply because the closure orders did not prevent Fitness International from continuing construction on the premises or using them for other purposes. KB Salt Lake contended Fitness International's obligation to pay rent continued so long as it occupied the premises, regardless of the closure orders.

Second, KB Salt Lake argued Fitness International's defense under Civil Code section 1511 (section 1511), which excuses a party from performing contractual obligations under certain circumstances, did not apply. KB Salt Lake argued section 1511 did not apply because "the operation of law" did not prevent Fitness International from, or delay it in, paying rent (§ 1511, subd. (1)), nor did "an irresistible, superhuman cause" prevent Fitness International from performing its obligation to pay rent (*id.*, § 1511, subd. (2)).

Third, KB Salt Lake argued Fitness International could not rely on the doctrine of frustration of purpose to excuse its obligation to pay rent under the lease because the COVID-19 closure orders did not destroy the whole value of the performance of the lease. KB Salt Lake also contended that, for the frustration of purpose doctrine to apply, Fitness International had to terminate the lease or surrender the premises.

Fourth, KB Salt Lake argued Fitness International could not rely on the doctrine of impossibility or impracticality because the COVID-19 closure orders did not make it unlawful or impossible for Fitness International to perform its obligations under the lease, including paying rent. KB Salt Lake argued

10

Fitness International's performance was not legally impractical because the closure orders did not sufficiently increase the cost of Fitness International's performance.

Finally, KB Salt Lake argued there were no triable issues of material fact concerning Fitness International's defense based on alleged breaches of the lease by KB Salt Lake. In discovery responses, Fitness International stated KB Salt Lake breached the lease by failing to comply with KB Salt Lake's representation and warranty that Fitness International could use the premises for all uses permitted by the lease, including as a health club and fitness facility. KB Salt Lake argued it was Fitness International's failure to complete the renovations to the premises, not KB Salt Lake's actions or the COVID-19 closure orders, that prevented Fitness International from using the premises as a fitness facility. KB Salt Lake also argued that, even if it had breached the lease, any such breach would not relieve Fitness International of its obligation to pay rent, so long as Fitness International retained possession of the premises.

Fitness International's opposition to KB Salt Lake's motion for summary judgment rested on the premise the COVID-19 closure orders made it "illegal" for Fitness International to complete the renovations to the property. Fitness International argued that, despite language in the COVID-19 closure orders exempting construction workers and commercial construction from the stay-at-home orders, "retail construction was not included on the list of approved construction." Fitness International asserted the orders' reference to "construction of . . . commercial, office and institutional buildings" impliedly excluded "retail construction," as distinct from "commercial construction." Thus, Fitness International contended, it "ceased

11

all activities, including all construction related activities," to avoid violating state law and to protect its employees.

Regarding its force majeure defense, Fitness International argued it did not claim "financial inability or lack of funds, but rather that its obligation [to pay rent] was excused by the circumstances." Fitness International contended the COVID-19 closure orders were a "Force Majeure Event" under section 22.3 because the orders "'delayed or hindered'" Fitness International from performing "'any act'" required by the lease. In particular, Fitness International argued the COVID-19 closure orders delayed or hindered Fitness International from completing "construction and payment of rent." Fitness International argued the payment of money could not cure the cause of the delay because no amount of money could have eliminated the COVID-19 pandemic.

Regarding its defenses under section 1511, Fitness International argued it presented evidence the COVID-19 closure orders prevented it from renovating and using the premises for its intended use, thus excusing it from paying rent while the closure orders were in effect. Regarding the doctrines of frustration of purpose, impossibility, and impracticality, Fitness International argued California law recognized "temporary" versions of these doctrines as grounds to excuse rent payments during the time that the purpose of the contract was frustrated or that performance of obligations was impossible or impractical. Fitness International argued it produced evidence sufficient to raise a triable issue of material fact regarding whether the COVID-19 closure orders frustrated the purpose of the lease.

Regarding Fitness International's defense KB Salt Lake's alleged breaches of the lease excused the obligation to pay rent,

12

Fitness International argued KB Salt Lake violated its covenant under the lease to ensure Fitness International could use the premises as a health club and fitness facility. Fitness International contended its obligation to pay rent was dependent on "its right to complete construction of the fitness facility and occupy the Premises for its intended use, and because Fitness [International] was prevented from such, it [was] excused from paying rent."

The trial court agreed with KB Salt Lake on every issue and granted the motion for summary judgment. The court first ruled KB Salt Lake established each element of its unlawful detainer cause of action. The court then concluded the COVID-19 pandemic did not excuse Fitness International's failure to pay rent under the force majeure clause because that provision excluded "'failures to perform . . . which can be cured by the payment of money.'" The court also ruled that, even if the COVID-19 closure orders were a "Force Majeure Event" under section 22.3, Fitness International did not cite any evidence showing the closure orders prevented it from paying rent; "[i]n fact," the court said, Fitness International "admitted it had the funds to pay rent." The court also concluded the closure orders did not prevent Fitness International from using the premises as a fitness club because "there was no fitness club building at the Premises to operate" due to Fitness International's decision to stop construction.

The trial court rejected Fitness International's defense under section 1511, ruling neither the COVID-19 closure orders nor any "'irresistible, superhuman cause'" prevented or delayed Fitness International from paying rent. The court concluded the doctrine of frustration of purpose did not apply because "'the

13

whole value of the performance to one of the parties'" was not destroyed. The court determined the purpose of the lease was "to eventually operate a fitness center on the Premises once [Fitness International] completed renovations to the property." The court stated "both parties contemplated that [Fitness International] would need to complete the renovation work . . . before it could operate the Premises as a fitness facility. [Fitness International's] claim that it was prevented from completing the renovations due to COVID-19 and government orders is without merit. [Fitness International] chose to stop construction. No orders in California required commercial construction to cease. Rather, construction was expressly excepted from the relevant orders restricting activity . . . . As such, frustration of purpose does not apply because the purpose of the Lease agreement had not been destroyed, which is clear since [Fitness International] did not terminate the Lease or surrender the Premises."

The trial court similarly rejected Fitness International's defenses based on impossibility and impracticality. The court ruled the COVID-19 closure orders did not make it unlawful or more costly for Fitness International to perform its obligation to pay rent, nor did they hinder, delay, or prevent Fitness International from continuing its renovation of the premises.

Finally, the court rejected Fitness International's defense based on KB Salt Lake's alleged breach of the lease. First, the court ruled, nothing in the lease required KB Salt Lake to guarantee Fitness International could use the premises as a health and fitness club. Second, the court concluded, Fitness International breached its obligation to "'proceed with due diligence'" to complete the renovations on the premises by "abandon[ing] construction of the property rationalizing it under

14

an incorrect interpretation of the [COVID-19 closure orders] and while admittedly having funds to pay for construction." The court ruled that, as a result of Fitness International's actions, the premises were "unfit to operate as a fitness facility." Finally, the court agreed with KB Salt Lake's argument that, even if KB Salt Lake breached the lease, any such breach would not relieve Fitness International of its obligation to pay rent under California law.

The trial court entered judgment for KB Salt Lake. Fitness International timely appealed.

## DISCUSSION

A.  *Applicable Law and Standard of Review*

Code of Civil Procedure section 1161 et seq. governs unlawful detainer actions. """The statutory scheme is intended and designed to provide an expeditious remedy for the recovery of possession of real property.""" (*Borden v. Stiles* (2023) 92 Cal.App.5th 337, 344.) The remedy is available to a lessor against a lessee for unlawfully holding over or for breach of a lease. (*Ibid.*; see *Taylor v. Nu Digital Marketing, Inc.* (2016) 245 Cal.App.4th 283, 288.)

A "tenant of real property is guilty of unlawful detainer" where the tenant, among other circumstances, "is in default for nonpayment of rent." (*Stancil v. Superior Court* (2021) 11 Cal.5th 381, 395; see Code Civ. Proc., § 1161, subd. (2) [a landlord states a cause of action for unlawful detainer where the "tenant continues in possession . . . without the permission of the landlord . . . after default in the payment of rent"].) "The basic elements of unlawful detainer for nonpayment of rent . . . are (1) the tenant is in possession of the premises; (2) that

15

possession is without permission; (3) the tenant is in default for nonpayment of rent; (4) the tenant has been properly served with a written three-day notice; and (5) the default continues after the three-day notice period has elapsed." (*Kruger v. Reyes* (2014) 232 Cal.App.4th Supp. 10, 16.)  "The procedures governing a motion for summary judgment in an unlawful detainer action are streamlined (e.g., separate statements are not required under section 437c, subdivision (s) of the Code of Civil Procedure), but such a motion 'shall be granted or denied on the same basis as a motion under'" Code of Civil Procedure section 437c.  (*Borden v. Stiles, supra,* 92 Cal.App.5th at pp. 344-345; see Code Civ. Proc., § 1170.7.)

"Summary judgment should be granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law." (*Brewer v. Remington* (2020) 46 Cal.App.5th 14, 23; see Code Civ. Proc., § 437c, subd. (c); *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)  "In moving for summary judgment, a 'plaintiff . . . has met' his 'burden of showing that there is no defense to a cause of action if' he 'has proved each element of the cause of action entitling' him 'to judgment on that cause of action.  Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.  The defendant . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.'" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849; accord, *Borden v. Stiles, supra,*

16

92 Cal.App.5th at p. 345; see *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 564-565 [on a plaintiff's motion for summary judgment the defendant has the burden to show a triable issue of fact regarding an affirmative defense].)

"On appeal, we review the record and the determination of the trial court de novo, viewing the evidence in the light most favorable to" the losing party. (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2022) 77 Cal.App.5th 971, 982; see *Hampton v. County of San Diego*, *supra*, 62 Cal.4th at p. 347; *Rheinhart v. Nissan North America, Inc.* (2023) 92 Cal.App.5th 1016, 1024.) "'"[W]e take the facts from the record that was before the trial court when it ruled on [the] motion. [Citation.] . . . We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."'" (*Hampton*, at p. 347; see *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)

"We apply de novo review to questions of law regarding statutory interpretation. [Citation.] 'We also independently review contractual agreements, including the question of whether the language used in a contract is ambiguous.'" (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange*, *supra*, 77 Cal.App.5th at pp. 982-983; see *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 433 [trial court's ruling on whether contractual language is ambiguous is a question of law subject to independent review].) "'We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale.'" (*Dameron*,

17

at p. 983; *Rheinhart v. Nissan North America, Inc., supra*, 92 Cal.App.5th at p. 1024.)

Fitness International challenges the trial court's ruling KB Salt Lake met its burden to show there is no triable issue of material fact concerning the third element of a cause of action for unlawful detainer, i.e., that the tenant is in default for nonpayment of rent. In particular, Fitness International argues it was not in default because the lease did not obligate Fitness International to pay rent while the COVID-19 closure orders were in effect. Fitness International also argues the trial court erred in ruling Fitness International failed to show a triable issue of material fact on any of its affirmative defenses. All of Fitness International's arguments are based, to some extent, on its assertion the COVID-19 closure orders "made it illegal" to complete the renovations to the premises. Thus, we begin with Fitness International's arguments challenging the trial court's ruling to the contrary.

B. *The COVID-19 Closure Orders Allowed Fitness International To Continue Renovating the Premises*

Fitness International argues the trial court erred in interpreting the COVID-19 closure orders to exclude commercial construction, including the renovations to the premises, from the orders' restrictions. In making this argument, Fitness International invents the term "retail construction," which did not appear in the closure orders, and asserts the term's absence from the closure orders meant the orders prohibited "retail construction." The plain language of the closure orders does not support Fitness International's fanciful attempt at excusing its decision to cease construction.

18

As stated, the COVID-19 closure orders issued by the City of Los Angeles allowed residents to continue to work on "Essential Infrastructure" projects, including "*without limitation* construction of commercial and institutional buildings." (Los Angeles Public Order Under City of Los Angeles Emergency Authority (Mar. 19, 2020) § 5(ix), italics added; see Los Angeles Public Order Under City of Los Angeles Emergency Authority (May 27, 2020) § 5(ix) [allowing residents to perform work necessary "to build, operate, maintain or manufacture essential infrastructure, including *without limitation* construction of . . . commercial, office and institutional buildings"], italics added.) Neither the original nor the revised order referred to "retail construction" or otherwise qualified the ordinary meaning of "construction of commercial . . . buildings."

Similarly, the COVID-19 closure orders issued by the County of Los Angeles allowed "Essential Businesses," including commercial construction, to continue. The original order issued March 21, 2020 stated: "All persons are to remain in their homes or at their place of residence, *except to travel to and from Essential Businesses, to work at . . . Essential Infrastructure,* . . . or to participate in an individual or family outdoor activity, while practicing social distancing." (Los Angeles County Dept. of Public Health, Order of the Health Officer, § 1 (Mar. 21, 2020), italics added.) The order defined "Essential Businesses" and "Essential Infrastructure" to include commercial construction, without excepting or referring to construction of retail establishments. "Essential Businesses" included "Construction Workers who support the construction, operation, inspection, and maintenance of construction sites and construction projects

19

(including housing construction)." (*Id.*, § 13(x).)[4] "Essential Infrastructure" included "construction of commercial, office, and institutional buildings," again without any qualification concerning "retail" commercial construction. (*Id.*, § 15(b).) And as discussed, the later closure orders issued by the County included the same definition of "Essential Businesses."

We interpret city ordinances and agency rules and regulations the same way we interpret statutes, by starting with the text as the best indication of the measure's intent and purpose. (*Fischl v. Pacific Life Insurance Company* (2023) 94 Cal.App.5th 108, 121; see *O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1117 [""Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations," as well as the interpretation of 'policies promulgated by administrative bodies.'"]; *Ngu v. City Bail Bonds* (2021) 71 Cal.App.5th 644, 649 ["Rules of 'statutory construction govern [the] interpretation of regulations promulgated by administrative agencies.'"]; *TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1374 ["the rules of construction applying to statutes apply equally to ordinances"].) "If the text is unambiguous and consistent with the purpose of the regulation, our analysis ends." (*Fischl*, at pp. 121-122; see *Aguiar v. Superior Court* (2009) 170 Cal.App.4th 313, 324.) If not, we may look to a variety of extrinsic aids, including the measure's legislative history and public policy. (*Fischl*, at p. 122; *Butts v. Board of Trustees of California State University* (2014) 225 Cal.App.4th 825, 836;

---

[4] Although the closure order capitalized the initial letters of the term "Construction Worker," the order did not define the term.

*Aguiar*, at p. 324.)  The plain language of the City and County closure orders, and the orders continuing their effective dates, excluded commercial construction, such as the renovations of the premises, from businesses that had to cease operations.  Thus, as a matter of law, the COVID-19 closure orders did not prevent Fitness International from continuing the renovations to the premises.

Fitness International argues its (invented) distinction between "retail" commercial construction and other commercial construction "makes sense in the context of the Pandemic" because the construction of nonessential retail establishments was not necessary to maintain critical infrastructure such as hospitals, airports, and roadways.  But the COVID-19 closure orders allowed more than "critical" infrastructure projects to continue.  They also allowed "Essential Businesses" to continue, and both the City and County orders defined "Essential Businesses" to include commercial construction.  In addition, the Los Angeles County COVID-19 closure orders listed many types of commercial properties and businesses that had to close or shut down, and "retail construction" was not one of them.  (See, e.g., Los Angeles County Dept. of Public Health, Order of the Health Officer, § 3 (Mar. 21, 2020).)  The omission of any reference to "retail construction" among the lengthy list of businesses that had to close confirms the COVID-19 closure orders did not require "retail construction" projects to stop.  (See *Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 ["The expression of some things in a statute necessarily means the exclusion of other things not expressed."]; *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 590 [same]; *Garson v. Juarique* (1979) 99 Cal.App.3d 769, 774 [under the doctrine of *expressio unius est*

21

*exclusio alterius*, "the expression of one thing in a statute implies the intentional exclusion of the omitted thing"].)[5]

Moreover, Fitness International does not identify any ambiguity in the language of the COVID-19 closure orders that would allow us to consider extrinsic interpretive aids such as public policy (see *Butts v. Board of Trustees of California State University*, *supra*, 225 Cal.App.4th at p. 836), and even if it did, Fitness International did not identify any evidence that would support a policy distinction between non-retail commercial construction and retail commercial construction. Fitness International cites cases, mostly from other jurisdictions, having nothing to do with the COVID-19 closure orders that (according to Fitness International) "refer[ ] separately to commercial and retail development," but which do so for reasons specific to those cases and which do not cite or rely on any such distinction. (See, e.g., *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 679 [referring to "commercial and retail space" in describing downtown San Francisco's preservation policies]; *T-C Forum at*

---

[5] The inference under the *expressio unius* doctrine that a legislature did not intend to include an excluded item from a list "arises when there is reason to believe a legislative omission was intentional." (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 636.) That principle applies here because another section of the Los Angeles County closure orders listed various types of construction that could continue, including construction of commercial, office, institutional, residential, and housing projects. (See *Barron v. Superior Court* (2023) 90 Cal.App.5th 628, 638 [including a term in a list in a statute, but excluding it from another list in the same statute, indicates the exclusion was intentional].)

*Carlsbad, LLC v. Thomas Enterprises, Inc.* (S.D.Cal., Aug. 14, 2017, No. 16-cv-2119 DMS (BGS)) 2017 WL 3492159, p. 6 [plaintiff sought a permanent injunction against the defendant's use of the word "Forum" in connection with "commercial or retail real estate"]; *Friends of Roeding Park v. City of Fresno* (E.D.Cal. 2012) 848 F.Supp.2d 1152, 1158 [plaintiff objected to a city's approval of a zoo expansion plan, arguing "it would result in commercial and retail development of land previously used for open space recreational uses"].)

Fitness International also argues that, "[a]t the very least," whether its interpretation of the COVID-19 closure orders was "reasonable" is a factual issue. But interpreting city ordinances and agency rules and regulations is a question of law, not fact, and Fitness International's subjective understanding of the COVID-19 closure orders is irrelevant. (See *Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 662 [interpreting a statute is a question of law]; *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 225 ["'ultimately statutory interpretation is a question of law the courts must resolve'"]; *McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252, 1266 [where the meaning of a municipal code section was "clear and unambiguous as a matter of law," a city planner's interpretation of the statute was irrelevant].)

C.    *The Force Majeure Provision Did Not Excuse Fitness International from Paying Rent*

Fitness International argues the trial court misinterpreted and misapplied the force majeure provision in section 22.3 of the lease. "When interpreting a contract, a court seeks to ascertain the mutual intent of the parties solely from the written contract

23

so long as possible." (*West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1185 (*West Pueblo Partners*); see *Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916.) "When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement." (*Gilkyson*, at p. 916; see *Brown v. Goldstein*, *supra*, 34 Cal.App.5th at p. 432.)

First, Fitness International argues section 22.3 applies when the "purpose" of the lease is delayed, hindered, or prevented by a "Force Majeure Event." Fitness International further argues that the purpose of the lease was for Fitness International "to operate the Premises as an indoor gym (and to perform [the renovations] in order to do so)" and that the COVID-19 pandemic prevented Fitness International from operating the premises as a gym. The language of section 22.3 does not support Fitness International's interpretation. Section 22.3 applies "[i]f either party is delayed or hindered in or prevented from the performance of any *act* required hereunder because of . . . a 'Force Majeure Event' . . . ." The provision further provides that the "performance of *such act* shall be excused for the period of delay caused by Force Majeure Events and the period for the performance of such *act* shall be extended for an equivalent period . . . ." Section 22.3 plainly applies only when an "act" required under the lease, not its "purpose," is delayed, hindered, or prevented. Fitness International admitted it had the funds to pay rent, despite the COVID-19 closure orders. Thus, because the COVID-19 pandemic did not delay, hinder, or prevent Fitness International from the act of paying rent, section 22.3 did not excuse Fitness International's obligation to pay rent. And, in any event, the COVID-19

24

pandemic did not delay, hinder, or prevent the parties from fulfilling the purpose of the lease Fitness International identifies because Fitness International never completed the renovations to the premises.[6]

Fitness International argues that interpreting section 22.3 to apply where "the fundamental purpose of the Lease is hindered or prevented by the occurrence of a Force Majeure Event" is "more reasonable" than the trial court's "hyper-technical" interpretation. But because section 22.3 is "clear and explicit" in this regard, we look only to its plain language to determine the parties' intent. (*West Pueblo Partners*, *supra*, 90 Cal.App.5th at p. 1185; *Gilkyson v. Disney Enterprises, Inc.*, *supra*, 66 Cal.App.5th at p. 916.) We consider extrinsic evidence only when a contract is ambiguous, "that is, reasonably susceptible to more than one interpretation." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 986; see *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195 [a contract provision is ambiguous "'when it is capable of two or more constructions, both of which are reasonable'"].) There is nothing ambiguous in section 22.3's reference to the word "act," which is employed twice in the same way in that provision. In both instances, section 22.3 refers to the "performance" of an "act"

---

[6] Fitness International argued in the trial court the COVID-19 closure orders "at a minimum delayed and hindered [its] construction activities," but Fitness International produced no evidence to support that contention.

25

"required" by the lease.[7]  Parties do not typically "perform" purposes of a contract, nor are purposes of a contract generally "required" by its terms.  We will not give the word "act" an unreasonable interpretation to deem section 22.3 ambiguous. (See *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37 ["'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.'"]; *Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1180 [same].)[8]

---

[7] The provision first refers to "the performance of any act required hereunder" and then refers to the "performance of such act."

[8] Fitness International cites several cases from other states purportedly holding that "nearly identical lease provisions" excused the payment of rent during government-ordered business closures as "evidence that Fitness [International's] interpretation of nearly identical lease provisions is at least plausible." Plausibility is relevant to whether section 22.3 is ambiguous. (See *California Dept. of Human Resources v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 1420, 1430 ["An ambiguity exists when language as applied to a concrete dispute is reasonably susceptible of different, plausible, meanings."].)  But even if section 22.3 were ambiguous regarding its application to Fitness International's obligation to pay rent (which it isn't), the holdings of other courts interpreting different contracts involving different parties and circumstances would not be extrinsic evidence of the intent of the parties to the lease in this case.  The types of extrinsic evidence relevant to resolving an ambiguity include "[t]he circumstances surrounding and leading to the execution of a contract" (*Kashmiri v. Regents of University*

26

Fitness International also argues that its interpretation of section 22.3 is "consistent with how the parties equitably allocated risk based on fault and insurability throughout the Lease (see, e.g., §§ 15.1, 15.4, 16.1)" and, citing Civil Code section 1641, that the court must interpret a contract by considering the entire contract and giving "'effect to every part, if reasonably practicable, each clause helping to interpret the other.'" To the extent it did not forfeit this argument by failing to make it in the trial court (see *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065), Fitness International does not explain how interpreting the word "act" to mean "act" and not "purpose" is inconsistent with the lease provisions it identifies, which concern extending the lease in the event of damage to the premises by "fire or other casualty" (§ 15.1), abatement of rent in the event damage or destruction interferes with Fitness International's business operations (§ 15.4), and takings by eminent domain or condemnation (§ 16.1).

Second, Fitness International argues the trial court erroneously interpreted section 22.3 by "conflating what *constitutes* a Force Majeure Event with what may be *excused* by a Force Majeure Event." The first sentence of section 22.3 provides a nonexclusive list of examples of potential Force Majeure Events, such as strikes, insurrection, war, and fire. According to

_____

*of California* (2007) 156 Cal.App.4th 809, 838), a "party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms" (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393), and industry custom or practice (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1357).

27

Fitness International, the second sentence "states what *cannot* constitute a Force Majeure Event," namely, "[d]elays or failures to perform resulting from lack of funds or which can be cured by the payment of money." Section 22.3 states that such delays or failures "shall not be Force Majeure Events." KB Salt Lake argues that, instead of defining what shall not "be" a Force Majeure Event, the second sentence of section 22.3 identifies the types of performance, such as the payment of rent, that a Force Majeure Event does not excuse. But regardless of who wins this battle, Fitness International has lost the war: Even if the COVID-19 pandemic is, under the lease, a Force Majeure Event that could excuse obligations requiring only the payment of money, Fitness International cannot show it was delayed, hindered, or prevented from paying rent "because of" the COVID-19 pandemic, as required by section 22.3. As discussed, Fitness International conceded it had the funds to pay rent, despite the COVID-19 pandemic. Thus, Fitness International was not prevented from performing "because of" the COVID-19 pandemic. (See *SVAP III Poway Crossings, LLC v. Fitness International, LLC* (2023) 87 Cal.App.5th 882, 892-893 (*Poway Crossings*) [force majeure clause did not excuse Fitness International from paying rent where there was "no evidence or argument . . . the pandemic and resulting government orders hindered Fitness [International's] ability to pay rent"]; see also *West Pueblo Partners*, *supra*, 90 Cal.App.5th at p. 1188 [no triable issue of fact regarding whether the COVID-19 pandemic prevented a lessee from paying rent where, even though the pandemic affected the lessee's business operations, the lessee admitted it had the financial resources to pay rent].)

28

Fitness International similarly argues that the parties did not carve out "'rent'" from section 22.3, meaning any Force Majeure Event would excuse the parties from performing all obligations under the lease, including payment of rent, regardless of whether the Force Majeure Event was the cause of the delay in performance. Again, that's not what section 22.3 says. It says: "If either party is delayed or hindered in or prevented from the performance of any act required hereunder *because of* . . . a 'Force Majeure Event,'" then "performance of *such act* shall be excused . . . ." Thus, the performance of a specific act, such as payment of rent, must be delayed or hindered by the Force Majeure Event before section 22.3 excuses the obligation to perform the act. (See *West Pueblo Partners*, *supra*, 90 Cal.App.5th at p. 1188 ["[a]lthough a force majeure provision is often included in a contract to specify which qualifying events will trigger its application, the qualifying event must have still caused a party's timely performance under the contract to 'become impossible or unreasonably expensive,'" italics omitted].)

Fitness International argues in its reply brief the COVID-19 pandemic "hindered" its ability to pay rent because it could not bill members when the gym was closed, was forced to stop operating its California locations and close its corporate office, furloughed over 25,000 employees, and could not continue renovating the premises in Chatsworth. Fitness International, however, did not have a cash flow problem. It admitted it had the funds to pay rent. Moreover, even if Fitness International were operating at a loss (and there is no evidence it was), that alone would not excuse Fitness International from paying rent under section 22.3. For example, in *West Pueblo Partners*, *supra*, 90 Cal.App.5th 1179 the court rejected an argument of a

29

commercial tenant, which operated a brewpub,[9] that the force majeure provision in its lease excused it from paying rent while local COVID-19 closure orders restricted the brewpub's operations. (*Id.* at pp. 1191-1192.) Like Fitness International, the tenant in *West Pueblo Partners* admitted that it could have made rent payments, but argued that it would have been more costly to do so because local restrictions on indoor dining "were 'devastat[ing]' to its operating profits" and forced the brewpub to lay off the "vast majority" of its employees. (*Id.* at pp. 1183-1184.) In affirming an order granting the landlord's motion for summary judgment, the court held the force majeure provision in the lease, which was similar to section 22.3,[10] did not excuse the obligation to pay rent: The tenant's "ability to pay rent must have been 'delayed, interrupted, or prevented' by COVID-19 because timely performance would have either been impossible or

---

[9]     A brewpub is "a business that serves beer that has been manufactured on the premises." (*Tony's Taps, LLC v. PS Enterprises, Inc.* (D.Colo., Mar. 29, 2012, No. 08-CV-01119-MSK-KLM) 2012 WL 1059956, p. 8; see *R.S.S.W., Inc. v. City of Keego Harbor* (E.D.Mich. 1998) 18 F.Supp.2d 738, 741, fn. 3 ["A 'brewpub' serves alcohol and food and is typically distinguished by the fact that, aside from the usual selection of alcohol, it also serves beer brewed on the premises."].)

[10]     The force majeure provision in *West Pueblo Partners* stated: "If either Party is delayed, interrupted or prevented from performing any of its obligations under this lease, and such delay, interruption or prevention is due to [a force majeure event], then the time for performance of the affected obligations of the Party shall be extended for a period equivalent to the period of such delay, interruption or prevention." (*West Pueblo Partners*, *supra*, 90 Cal.App.5th at p. 1187.)

was made impracticable due to extreme and unreasonable difficulty.  There is no triable issue of fact as to this issue because [the tenant] admitted that it had the financial resources to pay rent . . . for the subject months, even though the brewpub . . . was operating at a loss.  The mere fact that [the tenant] was generating less revenue during this time period did not render its performance impossible or impracticable, and the force majeure event therefore did not impair [the tenant's] ability to pay its rent.  [The tenant] merely argues that the force majeure event made it more costly to do so." (*Id.* at p. 1188, italics omitted.)

Fitness International argues *West Pueblo Partners* is distinguishable because the tenant in that case "was able to operate in some capacity during the entire closure period."  But so was Fitness International.  It could have continued construction on the renovated gym so that the gym could reopen as soon as the COVID-19 closure orders allowed.  Instead, the gym remained unusable even after the closure orders permitted indoor gyms to operate "in some capacity."  Because the COVID-19 pandemic did not delay, hinder, or prevent Fitness International from paying rent, section 22.3 did not excuse that obligation.

Fitness International next argues that whether the COVID-19 pandemic delayed, hindered, or prevented its renovations of the premises is a factual issue that precludes summary judgment.  Had Fitness International produced any evidence of such delay, hindrance, or prevention, perhaps there may have been a factual issue.  But it didn't.  In the trial court Fitness International argued only that the COVID-19 closure orders "at a minimum delayed and hindered [its] construction activities," but Fitness International did not submit any evidence

31

of how or for how long or at what cost.  "[I]t is axiomatic that the party opposing summary judgment "'must produce admissible evidence raising a triable issue of fact.'"'"  (*All Towing Services LLC v. City of Orange* (2013) 220 Cal.App.4th 946, 960; see *Santa Ana Unified School Dist. v. Orange County Development Agency* (2001) 90 Cal.App.4th 404, 411.)  Yet Fitness International produced none to support its claim the COVID-19 closure orders delayed, hindered, or prevented construction.[11]

Finally, and in connection with its argument the trial court erroneously interpreted section 22.3, Fitness International argues its obligation to pay rent was excused by KB Salt Lake's alleged breach of its covenant in section 1.9 that Fitness International would have the "right throughout the Term [of the lease] to operate the Premises . . . for uses permitted under [the] lease."  Section 1.9, however, qualifies that obligation by stating it is "[s]ubject to all applicable laws," which included the COVID-19 closure orders.  Thus, the lease did not obligate KB Salt Lake to guarantee future applicable laws would allow Fitness International to operate the premises as a construction site, gym, or health club throughout the term of the lease.

Fitness International argues, for the first time in its reply brief, that "[s]ubject to all applicable laws" meant subject to "laws that were foreseeable at the time of contracting."  Without citing any evidence, Fitness International asserts "[n]either party contemplated there would be an outright prohibition on operating indoor gyms at the time of contract."  But the parties did

---

[11]     Fitness International states in its reply brief it laid off its construction project manager, but as explained, the project manager could have continued working on the renovation project under the COVID-19 closure orders.

32

contemplate in section 22.3 that "restrictive laws . . . beyond the reasonable control" of the parties could delay, hinder, or prevent a party from performing an act under the lease. Thus, even if Fitness International had not forfeited this argument by failing to make it in its opening brief (see *Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 653), the phrase "subject to all applicable laws" would still be unambiguously broad enough to include the COVID-19 closure orders.

>    D.     *Temporary Frustration of Purpose Did Not Excuse*
>            *Fitness International from Paying Rent*

Fitness International argues the trial court erred in ruling the doctrine of frustration of purpose did not excuse Fitness International from paying rent. Specifically, Fitness International argues the trial court erroneously rejected its arguments that California law recognizes "temporary" frustration of purpose and that under that doctrine the COVID-19 pandemic temporarily excused Fitness International's obligation to pay rent. Even if temporary frustration of purpose is a viable theory under California law, however, Fitness International did not show the doctrine excused its obligation to pay rent.

"The doctrine of frustration excuses contractual obligations where "'[p]erformance remains entirely possible, but the whole value of the performance to one of the parties at least, and the basic reason recognized as such by *both* parties, for entering into the contract has been destroyed by a supervening and unforeseen event.'" [Citation.] A party seeking to escape the obligations of its lease under the doctrine of frustration must show: (1) the purpose of the contract that has been frustrated was contemplated by *both* parties in entering the contract; (2) the risk

of the event was not reasonably foreseeable and the party claiming frustration did not assume the risk under the contract; and (3) the value of counter-performance is totally or nearly totally destroyed. [Citations.] Governmental acts that merely make performance unprofitable or more difficult or expensive do not suffice to excuse a contractual obligation." (*Poway Crossings*, *supra*, 87 Cal.App.5th at p. 895; see *Lloyd v. Murphy* (1944) 25 Cal.2d 48, 55; *Dorn v. Goetz* (1948) 85 Cal.App.2d 407, 410-413.) Where the doctrine of frustration applies, "the 'legal effect . . . is the immediate termination of the contract.'" (*Poway Crossings*, at p. 896; see *Johnson v. Atkins* (1942) 53 Cal.App.2d 430, 435; see also *20th Century Lites, Inc. v. Goodman* (1944) 64 Cal.App.2d Supp. 938, 945 ["frustration brings the contract to an end forthwith"].)

At least two courts have held California law does not recognize "temporary" frustration of purpose, which ostensibly excuses a party's performance under a contract temporarily until the cause of the frustration abates. (See *Poway Crossings*, *supra*, 87 Cal.App.5th at p. 896; *20th Century Lites, Inc. v. Goodman*, *supra*, 64 Cal.App.2d Supp. at p. 945.) This conclusion follows from the legal effect of the frustration doctrine, which terminates the contract. (*Poway Crossings*, at p. 896; *20th Century Lites*, at p. 945.) Fitness International cites *Maudlin v. Pacific Decision Sciences Corp.* (2006) 137 Cal.App.4th 1001 for the proposition California law does recognize temporary frustration of purpose, but *Maudlin* addressed the doctrine of temporary impossibility or impracticability, not temporary frustration of purpose. (See *id.* at p. 1017.) In so doing, the court in *Maudlin* quoted the Restatement Second of Contracts, section 269, which, contrary to California law, conflates impossibility (and impracticability) of

34

performance and frustration of purpose. (*Maudlin*, at p. 1017; see *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 678, fn. 13 [doctrine of frustration of purpose "may, in consequence, appear to overlap" with doctrines such as impossibility of performance, but it is "a separate doctrine"]; *Autry v. Republic Productions, Inc.* (1947) 30 Cal.2d 144, 148 ["although the doctrines of frustration and impossibility are akin, frustration is not a form of impossibility of performance"]; *Lloyd v. Murphy*, *supra*, 25 Cal.2d at p. 53 ["frustration is not a form of impossibility"].)[12]  Thus, *Maudlin* does not stand for the proposition California law recognizes temporary frustration of purpose.

We need not decide this issue, however, because Fitness International did not show temporary frustration of purpose excused it from paying rent. Fitness International argues the purpose of the lease "was to possess and use the Premises for the . . . 'operation of a health club and fitness facility.'" Fitness International further argues "[t]his purpose was temporarily, but *completely*, extinguished by . . . the Pandemic and government orders." Fitness International conveniently leaves out the additional purpose it identified elsewhere in its opening brief and in the trial court, which was "to renovate and then operate an indoor gym at the leased Premises." Fitness International did not submit any evidence the COVID-19 pandemic or the COVID-19 closure orders prevented it from completing the

---

[12]    The Restatement Second of Contracts states that "[i]mpracticability of performance *or frustration of purpose that is only temporary* suspends the obligor's duty to perform while the impracticability or frustration exists." (Rest.2d Contracts, § 269, italics added.)

renovations, which were necessary for Fitness International to operate the premises as a gym or for other permitted uses under the lease. Thus, Fitness International did not show the COVID-19 pandemic or closure orders destroyed, even temporarily, """"the whole value of the performance."""" (*Poway Crossings*, *supra*, 87 Cal.App.5th at p. 895; see *Lloyd v. Murphy*, *supra*, 25 Cal.2d at p. 55.)

Fitness International argues that the lease is a "monthly installment contract" and that each month it could not operate the premises as a fitness facility frustrated the purpose of the contract. Neither the pandemic nor the COVID-19 closure orders, however, prevented Fitness International from reopening the gym; the gym was under construction at the time the City and County issued their closure orders, and Fitness International never recommenced construction (even after the government allowed gyms to reopen).

Moreover, as KB Salt Lake argues, frustration of purpose did not excuse Fitness International from its obligation to pay rent (even if the lease was an "installment contract") because Fitness International did not attempt to rescind the lease and instead remained in possession of the premises. (See *Poway Crossings*, *supra*, 87 Cal.App.5th at p. 896 [Fitness International remained "obligated to pay rent while in possession of the premises"].) As the court in *Grace v. Croninger* (1936) 12 Cal.App.2d 603 explained, "even where the sole business to which premises are restricted by the terms of a lease becomes unlawful, the lease is not terminated merely by the enactment of the law declaring such business unlawful, but liability under the lease continues as long as the lessee continues in possession." (*Id.* at p. 603.) The court in *Grace* relied on an opinion by the

Supreme Court denying rehearing in *Industrial Development & Land Co. v. Goldschmidt* (1922) 56 Cal.App. 507, where the Supreme Court stated a lessee could not "continue to hold possession of the premises after the prescribed business became unlawful, and escape payment of the rent on the ground of such illegality, without surrendering to the lessor." (*Id.* at p. 512; see *Grace*, at p. 606.) As discussed, Fitness International remained in possession of the premises at least until it answered KB Salt Lake's complaint on October 19, 2021 (well after the COVID-19 closure orders ended restrictions on indoor gyms). Thus, even if California law recognized temporary frustration of purpose, and even if the lease is an "installment contract," Fitness International still had to make rent payments under the lease.[13]

E. *Temporary Impossibility or Impracticability Did Not Excuse Fitness International from Paying Rent*

Fitness International argues the trial court erred in rejecting its affirmative defense based on temporary impossibility or impracticability. The doctrine of impossibility includes "not only cases of physical impossibility but also cases of extreme impracticability of performance." (*Lloyd v. Murphy*, *supra*, 25 Cal.2d at p. 53; accord, *Dorn v. Goetz*, *supra*, 85 Cal.App.2d at

---

[13]  For the first time in its reply brief, Fitness International argues it did not remain in possession of the premises because "[i]t was illegal for any Californian to leave their home" when the COVID-19 closure orders were in effect. Even if Fitness International had not forfeited this argument by failing to raise it in its opening brief (see *Doe v. McLaughlin*, *supra*, 83 Cal.App.5th at p. 653), the argument is inconsistent with Fitness International's answer, which admitted Fitness International remained in possession of the premises.

37

p. 412; see *Kennedy v. Reece* (1964) 225 Cal.App.2d 717, 724 ["The enlargement of the meaning of 'impossibility' as a defense . . . to include 'impracticability' is now generally recognized."].) "Impossibility is defined 'as not only strict impossibility but [also] impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved.' [Citations.] The defense of impossibility may apply where, as here, a government order makes it unlawful for a party to perform its contractual obligations." (*Poway Crossings*, *supra*, 87 Cal.App.5th at p. 893; see *Autry v. Republic Productions*, *Inc.*, *supra*, 30 Cal.2d at pp. 148-149.)

In contrast to the doctrine of frustration, where "performance remains possible," the doctrine of impossibility or impracticability excuses performance of a contractual obligation when performance is impossible or extremely impracticable. (*Autry v. Republic Productions*, *Inc.*, *supra*, 30 Cal.2d at p. 148; see 30 Williston on Contracts (4th ed. 2023) § 77:94 [impracticability "makes performance of the obligation impossible or highly impracticable," whereas frustration of purpose makes performance of the promise "pointless"].) "'"A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost."'" (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1336,; see *Mineral Park Land Co. v. Howard* (1916) 172 Cal. 289, 293.) Circumstances that "'"may make performance more difficult or costly than contemplated when the agreement was executed do not constitute impossibility.'" (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 839; see *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977)

38

66 Cal.App.3d 101, 154.) A party cannot "avoid performance simply because it is more costly than anticipated or results in a loss." (*Habitat Trust for Wildlife*, at p. 1336; see *Kennedy v. Reece*, *supra*, 225 Cal.App.2d at p. 725 ["increased difficulties and heightened costs of a reasonable nature, even though originally unforeseen, do not render the performance of a contract 'impracticable'"].)

Fitness International argues the trial court erred in ruling that, because it was neither impossible nor impracticable for Fitness International to pay rent when the COVID-19 closure orders were in effect, the doctrines of impossibility and impracticability did not apply. Fitness International maintains those doctrines excused its obligation to pay rent because "the cost to Fitness [International] of paying rent ha[d] increased exponentially." In the trial court, however, Fitness International did not submit any evidence of such exponential cost increases. Thus, Fitness International failed to create a triable issue of material fact on whether paying rent during the COVID-19 closure orders was impossible or impracticable. (See *All Towing Services LLC v. City of Orange*, *supra*, 220 Cal.App.4th at p. 960; *Santa Ana Unified School Dist. v. Orange County Development Agency*, *supra*, 90 Cal.App.4th at p. 411.)

Moreover, the lease required Fitness International to pay rent for at least 10 months while it renovated the premises without collecting membership fees. Fitness International presented no evidence paying rent for an additional six or seven months (assuming the renovations were completed on schedule) until indoor gyms reopened in March 2021 would amount to an ""excessive and unreasonable cost"" (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*, *supra*, 175 Cal.App.4th at

39

p. 1336) sufficient to implicate the doctrines of impossibility and impracticability. (See *Kashmiri v. Regents of University of California*, *supra*, 156 Cal.App.4th at p. 839 [although a financial crisis resulting in severe budget cuts to a university made performance "more difficult or costly than contemplated when the agreement was executed," it did not support an impossibility defense]; *Kennedy v. Reece*, *supra*, 225 Cal.App.2d at pp. 725-726 ["if a contractor agrees to build a structure and it is destroyed by fire or other casualty when only partly completed, the contractor is not relieved from his duty to rebuild merely because of the additional expense he must incur or the added difficulties he must overcome"].)

> F. *Section 1511 Did Not Excuse Fitness International from Paying Rent*

Section 1511 provides in relevant part: "The want of performance of an obligation, . . . in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate: (1) When such performance . . . is prevented or delayed by . . . the operation of law, even though there may have been a stipulation that this shall not be an excuse; (2) When it is prevented or delayed by an irresistible, superhuman cause, . . . unless the parties have expressly agreed to the contrary." Fitness International argues the trial court erred in ruling the "force majeure clause overrode sections 1511(1) and (2)." The trial court, however, also ruled Fitness International failed to raise a triable issue of material fact concerning the application of section 1511. The latter ruling was correct.

Section 1511, subdivision (1), did not apply because, as discussed, the COVID-19 closure orders did not prevent or delay

40

Fitness International from paying rent.  (See *Poway Crossings*, *supra*, 87 Cal.App.5th at p. 894.)  Section 1511, subdivision (2), did not apply because the "irresistible, superhuman cause" identified by Fitness International, the COVID-19 pandemic, did not prevent Fitness International from performing its contractual obligation to pay rent.  (See *Poway Crossings*, at p. 894.)  Fitness International argues the purpose of section 1511 "is to excuse performance under circumstances like these," but Fitness International cites no authority describing the purpose of section 1511, nor does Fitness International explain how the trial court's ruling was contrary to any such purpose.

## DISPOSITION

The judgment is affirmed.  KB Salt Lake is to recover its costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.                    FEUER, J.